[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
December 15, 2005
THOMAS  K. KAHN
CLERK

_____

No. 04-14669

_____

D. C. Docket No. 02-22240-CV-PCH

KRISHNA MAHARAJ,

Petitioner-Appellant,

versus

SECRETARY FOR THE DEPARTMENT OF CORRECTIONS,
James V. Crosby,
ATTORNEY GENERAL OF FLORIDA,
Charlie Crist,

Respondents-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(December 15, 2005)

Before HULL, MARCUS and HILL, Circuit Judges.

MARCUS, Circuit Judge:

Krishna Maharaj appeals from the district court's denial of his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 claiming that the state prosecutor's office improperly withheld Brady material, that he received ineffective assistance of counsel, and that he was denied his rights under the Vienna Convention on Consular Relations. The Florida Supreme Court denied Maharaj's application for post-conviction relief in all respects.

After thorough review, we affirm. The Florida Supreme Court's disposition of Maharaj's claims was neither contrary to nor an unreasonable application of clearly established federal law; nor was its decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

## I.

The basic facts and procedural history are straightforward. A state-court jury in Miami-Dade County, Florida found Maharaj guilty of two counts of first degree murder, two counts of kidnaping, and one count of unlawful possession of a firearm while engaged in a criminal offense, for the shooting deaths of Duane and Derrick Moo Young. Maharaj was sentenced to die for one of the murder counts, to life imprisonment without the possibility for parole for twenty-five years for the

second murder count, to two life sentences for the kidnaping counts, and to fifteen years' imprisonment for the firearm count. His convictions and sentences were upheld by the Florida Supreme Court on direct appeal. Maharaj v. State, 597 So. 2d 786 (Fla. 1992) ("Maharaj I"). His subsequent request for post-conviction relief was denied by the state trial court, which was, in turn, reversed by the Florida Supreme Court for failing to hold an evidentiary hearing and for failing to recuse in light of an ethical conflict. Maharaj v. State, 684 So. 2d 726 (Fla. 1996) ("Maharaj II"). On remand, the trial court denied Maharaj's post-conviction application for relief as to his conviction, but granted his request to vacate the death sentence. Maharaj v. State, 778 So. 2d 944 (Fla. 2000) ("Maharaj III"). A new penalty trial was ordered, after which Maharaj was sentenced to life imprisonment on the murder count for which he had previously been sentenced to die.

The facts giving rise to Maharaj's convictions, taken from the three opinions of the Florida Supreme Court and from the testimony presented at his trial, are these. Krishna Maharaj is a British national, born in Trinidad, who was living in South Florida in October of 1986. He owned and operated a newspaper, the *Caribbean Times*, that catered to the West Indian Community. In the spring of 1986, Maharaj approached Eslee Carberry, the owner of another South Florida

3

community newspaper, the *Caribbean Echo*, and told Carberry that Derrick Moo Young had stolen money from him. He gave Carberry documents that purported to corroborate his accusations about Derrick Moo Young, and paid the *Caribbean Echo* a $400 "sponsorship fee" to publish an article detailing the alleged theft.

After the article appeared in the *Caribbean Echo*, Derrick Moo Young contacted Carberry to provide his side of the story. Carberry testified that he met with Derrick Moo Young twice, and that Moo Young provided documents detailing a lawsuit he had filed against Maharaj. Subsequently, the *Caribbean Echo* published a series of articles describing Maharaj's alleged involvement in an illegal scam to take millions of dollars out of Trinidad.

The state's most important trial witness was Neville Butler, a reporter for the *Caribbean Echo*. Butler testified that in the course of writing for the *Caribbean Echo*, he had occasion to meet Derrick Moo Young and had assisted in writing some of the articles critical of Maharaj. At some point in September of 1986, Butler contacted the *Caribbean Times* after hearing from a friend that Maharaj might be interested in having Butler write for his paper too. He met with both Maharaj and Maharaj's wife, and although he was never officially hired, he wrote several articles for the *Caribbean Times* under various pen names.

4

Butler testified that shortly after he became associated with Maharaj and his periodical, Maharaj told him that Carberry and Moo Young were trying to extort money from Maharaj's relatives in Trinidad in exchange for suppressing still other stories critical of Maharaj and his family. Maharaj also told him that Carberry and Moo Young suggested to people in Trinidad that Butler was really behind the extortionate attempts. Butler said that Maharaj asked him to set up a meeting with Derrick Moo Young, so that Maharaj could: (1) extract a confession from Moo Young that he was actually behind the extortion and bribery; (2) require Moo Young to write two checks to repay him for the fraud; and (3) cause Butler to go to a bank with the checks and certify them, at which time Maharaj would permit Moo Young to leave.

Maharaj made it clear to Butler that Moo Young would not knowingly agree to a meeting with Maharaj. Accordingly, in order to trick Moo Young into meeting with Maharaj, a plan was devised whereby Butler would tell Moo Young, who was engaged in importing and exporting goods, that two individuals from the Bahamas (Eddie Dames and Prince Ellis) would be in Miami and that they were interested in purchasing goods for their catering business. Butler arranged for the meeting to be held on October 16, 1986, in Dames' room at the Dupont Plaza Hotel in Miami. He never informed Moo Young that Maharaj would be at the meeting.

5

Maharaj and Butler met at the Dupont on the morning of October 16. Butler gave Dames the keys to his rental car and instructed Dames that he would meet Dames in the lobby at around noon or 1:00 p.m. - - which would allow sufficient time to use Dames' room for the 11:00 a.m. meeting with Moo Young. When Derrick Moo Young arrived at the Dupont Plaza Hotel for the meeting, Butler was surprised to see that Moo Young had unexpectedly brought along his son, twenty-three-year-old Duane Moo Young.

As the Moo Youngs entered Dupont Plaza Hotel room 1215, Maharaj emerged from behind the door carrying a pillow in his left hand and a gun in his gloved right hand. Soon thereafter, an argument ensued, and Maharaj shot Derrick Moo Young in the leg. Maharaj then instructed Butler to tie up Duane and Derrick Moo Young. Before he could do so, Derrick Moo Young lunged at Maharaj, who again shot Derrick Moo Young, hitting him three or four more times. Maharaj then turned his attention to Duane Moo Young, who Butler had loosely tied to a chair with the cord from an immersion heater. While Maharaj was talking to Duane Moo Young, Derrick Moo Young managed to open the door to the hallway and attempted to crawl outside. Once he noticed the escape attempt, Maharaj shot Derrick Moo Young still again and dragged him back inside the room by his ankles.

Butler testified that Maharaj then went back to interrogating Duane Moo Young, attempting to verify what the Moo Youngs had done with the money allegedly extorted from Maharaj's relatives in Trinidad. Soon thereafter, a person identifying himself as a hotel security guard shouted from outside the room that he noticed blood in the hall and inquired whether everyone was all right. According to Butler, Maharaj moved towards the door and responded that everything was all right. After several minutes of silence, Maharaj opened the door, poked his head out into the hall and appeared to tell someone that everything was all right. After Maharaj re-entered the room, Duane Moo Young unsuccessfully lunged at Maharaj in an attempt to gain control of the gun. Maharaj continued to interrogate Duane Moo Young, this time on the top floor of the two-level hotel suite.

Butler, who remained on the lower floor, testified that he then heard a single shot from above, after which Maharaj came downstairs alone, and they both left the room. Maharaj and Butler took the elevator to the ground floor and retrieved Maharaj's car from the parking lot. They drove around the block. Butler voiced his opinion that they needed to wait at the hotel for Dames to return. Maharaj agreed, and they parked in front of the hotel for approximately three hours until Dames returned.

7

While parked in front of the hotel, Maharaj told Butler that he was just as guilty for what happened in the room as Maharaj was, because Butler had arranged the meeting and been present during the killings. Maharaj promised Butler that he would take care of him, stating that he would give Butler a job with the *Caribbean Times*, provide a down payment for Butler's house, and give him a car.

When Dames finally arrived at the Dupont, Butler exited the car, retrieved his car keys from Dames, and left the scene. Later that day, Maharaj contacted Butler and told him he wanted to meet at a Denny's restaurant near the Miami Airport so they could coordinate their stories. Butler subsequently met up with Dames and Ellis, who had given statements to police investigators. Dames and Ellis convinced Butler to contact the police. Butler then called the lead investigator on the case, Miami Police Detective John Buhrmaster, and explained what had happened in the hotel room. Butler brought Buhrmaster to the Denny's, where Maharaj was arrested.

The State presented other witnesses at trial who testified as to motive and prior acts by Maharaj that were consistent with the murders at the Dupont Plaza Hotel. For example, Tino Geddes, a journalist at the *Caribbean Echo*, testified that Maharaj had purchased camouflage clothing and exotic weapons and had twice attempted to ambush Eslee Carberry. Furthermore, Geddes said that on one

8

occasion, Maharaj met him at the Dupont Plaza Hotel, with a handgun, and asked Geddes to call Derrick Moo Young and Eslee Carberry and lure them to the hotel. Although Geddes called both, neither came.

The State also presented corroborating testimonial and physical evidence. Loretta Molaskey, a maid at the Dupont Plaza Hotel, testified that she thoroughly cleaned the room where the murders occurred (suite 1215) on the morning of October 16, 1986, and that it appeared as if nobody had slept in the room the night before. She said that at around 12:15 p.m., her boss summoned her to room 1215 where he saw blood on the hallway carpet outside the door. While there, she noticed that the room was double-locked from the inside, preventing her from opening it with the master key, and that there was no "Do Not Disturb" sign on the exterior of the door. Some five to ten minutes later, Molaskey was contacted by hotel security and again asked to return to room 1215. She did, discovering that the door was no longer double-locked and there was a "Do Not Disturb" sign hanging on the exterior doorknob. At the request of the security guard, she opened the door with the master key and discovered the bodies of Derrick and Duane Moo Young.

Other hotel employees testified similarly. Miguel Sueiras, Ms. Molaskey's boss, testified that when he summoned Molaskey to open the door to room 1215,

9

there was blood on the outside carpet, the door was double-locked, and there was no "Do Not Disturb" sign hanging on the doorknob. Jorge Aparicio, a security guard at the Dupont, testified that he too noticed blood outside room 1215, and when he asked whether everyone inside was all right, someone inside answered that everything was fine. He also noticed that there was no "Do Not Disturb" sign on the door at that time.

The State also presented a fingerprint expert who testified that Maharaj's fingerprints were found in approximately twelve places in room 1215, including on the "Do Not Disturb" sign that was found on the exterior doorknob when the room was opened, on the exterior portion of the entrance door, on the interior bathroom door and doorframe, on the top of the bureau, on a soda can found on the bureau, on the telephone and television, on the bottom of a glass tabletop, on a piece of paper left in an ashtray, on two newspapers, and on the torn plastic packages for the immersion cords.

A firearms expert testified that, based on multiple projectiles and fragments recovered from the hotel room and Derrick Moo Young's body, eight bullets were fired from a Smith & Wesson model 39, nine-millimeter semiautomatic pistol with a serial number less than 270000. Richard Bellrose, a city of Miramar police officer, testified that he sold a Smith & Wesson model 39 pistol, serial number

10

A235464, to his supervising lieutenant in 1986, who in turn sold the gun to Krishna Maharaj. Gregory Jansen, a City of Plantation police officer, testified that Krishna Maharaj was stopped for a traffic infraction on July 26, 1986, some three months before the murders, and that he found a Smith & Wesson model 39, nine-millimeter handgun, bearing serial number A235464, in the trunk of Maharaj's car. Finally, Sylvia Ramos, a crime scene technician with the City of Miami Police Department, testified that Derrick Moo Young had black gunpowder on the upper-right shoulder area of his shirt, a finding consistent with having been shot at very close range.

As noted, the state-court jury found Petitioner guilty on all counts. After his convictions were affirmed and he was denied state post-conviction relief on the guilt phase of his case, Maharaj petitioned for federal habeas relief. The application was referred to a federal magistrate judge, who recommended denying relief on all counts. Petitioner objected to the Report and Recommendation, and the district judge conducted a de novo review of the entire Petition. In a lengthy and comprehensive order, the district judge denied relief as to each of Petitioner's claims. Petitioner filed a timely appeal and the case is now properly before us.

**II.**

11

Maharaj commenced his federal habeas petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996), and, therefore, the provisions of that Act govern this appeal. Wade v. Battle, 379 F.3d 1254, 1259 (11th Cir. 2004). Under AEDPA, Petitioner was required to obtain a Certificate of Appealability ("COA") before he could appeal the district court's decision. See 28 U.S.C. § 2253(c)(1)(A). A COA must be specific in detailing the issues appropriate for appeal, and "appellate review is limited to the issues specified in the COA." Murray v. United States, 145 F.3d 1249, 1251 (11th Cir. 1998).

In the initial order denying habeas relief, the district court listed five issues as being worthy of appeal: 1) whether the State prejudicially suppressed discoverable Brady material by not disclosing the report of Neville Butler's polygraph examination; 2) whether the State prejudicially suppressed discoverable Brady material by not allowing access to or disclosing the contents of the victims' briefcase; 3) whether the State prejudicially suppressed discoverable Brady material by not disclosing any knowledge of or information in its control regarding the victims' life insurance policies; 4) whether Petitioner's trial counsel was constitutionally ineffective for not investigating allegations of pending charges and outstanding warrants against Petitioner in England before advising his client not to

12

testify during the guilt phase of his trial; and 5) whether, in light of recent opinions of the International Court of Justice ("I.C.J."), a federal court has jurisdiction to determine, on the merits, whether the State violated Petitioner's right to consular notification despite the Florida Supreme Court's finding that Maharaj had procedurally defaulted this claim by failing to raise it on direct appeal. The district court subsequently entered an amended COA, adding a sixth issue: whether Maharaj was prejudiced by the alleged Brady violations, when considered individually or in concert.

Maharaj moved for a COA, which we viewed as a request to expand the scope of the district court's COA. We denied that request. He now claims that he should be permitted to present every argument contained in his original federal habeas petition.[1] We deny this request and limit our review to the six issues outlined in the district court's COA. See Murray, 145 F.3d at 1251.

## III.

---

[1]The claims in his petition can generally be grouped this way: 1) denial of adequate resources to present his state collateral attack; 2) failure of the state courts to consider the aggregate effect of his claims; 3) numerous alleged Brady violations; 4) numerous allegations of ineffective assistance of counsel; 5) denial of the right to testify in his own defense; 6) numerous allegations of prosecutorial and judicial misconduct; 7) new evidence suggesting actual innocence; 8) numerous alleged Giglio violations; 9) perjured testimony at the grand jury proceedings; and 10) violations of international law.

After his appeal was filed in this Court, indeed after briefing was complete and an oral argument date had been scheduled, Petitioner asked us to stay consideration of the case pending resolution of a motion he filed in state court on September 2, 2005. The state court motion seeks post-conviction relief on the ground that Maharaj's rights under the Vienna Convention were violated when the arresting officers failed to inform him that he could contact the British consulate. Although the claim was previously presented in the state post-conviction proceedings, it was never considered on the merits because Maharaj failed to raise it on direct appeal. See Maharaj III, 778 So. 2d at 959 (holding that because Maharaj did not raise the Vienna Convention claim on direct appeal, Florida law procedurally barred him from doing so in post-conviction proceedings).

Rarely are we asked to stay appellate proceedings in deference to concurrent state litigation. However, in providing guidance to the district courts, where this situation arises more frequently, we have looked to the Supreme Court's decision in Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 96 S. Ct. 1236, 47 L. Ed. 2d 483 (1976). See Moorer v. Demopolis Waterworks & Sewer Bd., 374 F.3d 994, 997 (11th Cir. 2004) (noting that "[t]he Colorado River doctrine of exceptional circumstances authorizes a federal district court to dismiss or stay an action when there is ongoing parallel action in state court") (internal

14

quotation marks and citation omitted); see also Currie v. Group Ins. Comm'n, 290 F.3d 1, 9-13 (1st Cir. 2002) (analyzing the Colorado River factors in deciding whether it should stay a case currently on appeal in deference to concurrent state litigation).  In Colorado River, the Supreme Court cautioned that federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them" and that a federal case should be dismissed in deference to a state proceeding in only the most "exceptional" of circumstances.  427 U.S. at 817-18, 96 S. Ct. at 1246.

We have applied the following factors in considering whether to stay or dismiss a case because of concurrent state litigation:

> (1) the order in which the courts assumed jurisdiction over property; (2) the relative inconvenience of the fora; (3) the order in which jurisdiction was obtained and the relative progress of the two actions; (4) the desire to avoid piecemeal litigation; (5) whether federal law provides the rule of decision; and (6) whether the state court will adequately protect the rights of all parties.

TranSouth Fin. Corp. v. Bell, 149 F.3d 1292, 1294-95 (11th Cir. 1998) (summarizing the factors set forth by the Supreme Court in Colorado River and Moses H. Cone Mem'l Hosp. v. Mercury Constr. Co., 460 U.S. 1, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983)).  The decision of whether to stay a case, however, does not rest on a mechanical checklist, and the weight of each factor will vary from

15

case to case.  Moorer, 374 F.3d at 997 (noting that "[o]ne factor alone can be the sole motivating reason for the abstention").

Maharaj relies on three points in explaining why a stay would be appropriate here:  1) the I.C.J.'s opinion in Case Concerning Avena and Other Mexican Nationals (Mexico v. United States), 2004 I.C.J. 12 (Mar. 31); 2) a memorandum from President Bush to the Attorney General on February 28, 2005; and 3) the Supreme Court's recent order in Medellin v. Dretke, ---U.S.---, 125 S. Ct. 2088, 161 L. Ed. 2d 982 (2005). Petitioner suggests that he was never informed of his right to contact the British consulate after his arrest, in violation of the Vienna Convention, and that the state courts should have considered the merits of his claim, irrespective of the procedural bar.  That is the argument he makes in his newly filed state-court motion and the same one he now contends should cause us to stay these proceedings.  Application of the standards generally used in determining the wisdom of a stay yields the conclusion that we should go forward with Maharaj's appeal now.

To begin with, both the United States and the United Kingdom are parties to the Vienna Convention on Consular Relations.  Article 36 of the Vienna Convention provides that upon arrest, a foreign national has the right to contact the consular post of his home country, and that the arresting authorities must inform

16

the detainee of that right.  Vienna Convention on Consular Relations, art. 36(1)(b),

Apr. 24, 1963, 21 U.S.T. 77, 101, T.I.A.S. No. 6820.[2]  Once a detainee is informed

of his right to contact the local consulate's office, the arresting authorities must

forward any desired communications to that foreign office.  Id.

The Optional Protocol to the Vienna Convention further provides that

"[d]isputes arising out of the interpretation or application of the Convention shall

lie within the compulsory jurisdiction of the International Court of Justice."

Optional Protocol Concerning the Compulsory Settlement of Disputes, art. I, April

18, 1961, 21 U.S.T. 326, T.I.A.S. No. 6820 ("the Optional Protocol").  In March of

2004, the I.C.J. issued an opinion in a case brought by Mexico against the United

States on behalf of fifty-two Mexican nationals arrested in this country who

alleged that their rights of notification and contact had been denied them by

various domestic law enforcement authorities.  See Case Concerning Avena And

Other Mexican Nationals (Mexico v. United States), 2004 I.C.J. 12 (Mar. 31).  In

Avena, the I.C.J. held that an arresting authority must notify a foreign national of

---

[2]The Convention specifically provides that "if he so requests, the competent authorities of the receiving state shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner.  Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall also be forwarded by the said authorities without delay.  The said authorities shall inform the person concerned without delay of his rights under this sub-paragraph."  Vienna Convention on Consular Relations, art. 36(1)(b), Apr. 24, 1963, 21 U.S.T. 77, 101, T.I.A.S. No. 6820.

17

his rights regarding contact with the local consulate once the detaining officials realize the person is a foreign national, or once there are grounds to believe the person is probably a foreign national. Avena, 2004 I.C.J. 12, at 43. The I.C.J. found that those rights had been violated as to some of the named Avena plaintiffs, and the court ordered the United States to permit "review and reconsideration" of the relevant cases by United States courts, "with a view to ascertaining whether in each case the violation of Article 36 committed by the competent authorities caused actual prejudice to the defendant." Id. at 59-60. The I.C.J. also determined that the application of state procedural default rules prevented full effect from being given to those rights accorded under Article 36, and, therefore, that the application of procedural default rules violates Article 36. Id. at 57.

Following the I.C.J.'s decision in Avena, President Bush issued a memorandum to the Attorney General in which he ordered that the United States discharge its international obligations under the Avena decision by "having State courts give effect to the decision in accordance with general principles of comity in cases filed by the 51 Mexican nationals addressed in that decision." Medellin, 125 S. Ct. at 2090 (citing the February 28, 2005 memorandum from President George W. Bush to the Attorney General) (emphasis added). Shortly thereafter, however, the Secretary of State transmitted a letter to the Secretary General of the United

Nations withdrawing the United States from the Optional Protocol, see Medellin, 125 S. Ct. at 2101 (O'Connor, J., dissenting), thereby removing the United States from the provision of the Vienna Convention that provides jurisdiction to the I.C.J.

Thereafter, in the Medellin case, the Supreme Court granted certiorari to consider whether a federal court is bound by the holding of the I.C.J. in Avena, and whether a federal court should give effect, as a matter of judicial comity and uniform treaty interpretation, to the I.C.J.'s judgment. Medellin, 125 S. Ct. at 2089. Medellin, the petitioner in that case, was one of the fifty-two named Avena plaintiffs. The Court noted that Medellin had filed a successive state application for a writ of habeas corpus while his case was pending before the Supreme Court, and that this application "may provide Medellin with the review and reconsideration of his Vienna Convention claim that the ICJ required, and that Medellin now seeks in [the federal proceeding]." Id. at 2090. Additionally, the Court observed that there were five basic procedural issues it would have to address before it could reach the merits, including: 1) whether a violation of the Vienna Convention was one of those "nonconstitutional lapses" cognizable in a federal post-conviction proceeding; 2) whether the state court's judgment could be considered contrary to, or an unreasonable application of clearly established federal law; 3) whether or how the decision announced in Avena bears on the

19

normal requirement that a habeas petitioner cannot enforce a "new rule of law" pursuant to Teague v. Lane, 489 U.S. 288, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989); 4) whether a violation of the Vienna Convention could be considered a denial of a constitutional right for the purposes of a COA; and 5) whether the claims based on Avena and the President's memorandum were exhausted in state court. Medellin, 125 S. Ct. at 2090-92 (internal quotation marks omitted). Because of the possibility that the State of Texas might provide Medellin with the relief he was seeking, the Court thought it "unwise to reach and resolve the multiple hindrances to dispositive answers" lurking in Medellin's case. Id. at 2092. Accordingly, it dismissed certiorari as having been improvidently granted. Id.

With this background we apply the Colorado River factors to this case. Neither of the first two considerations is particularly helpful here, because there is no real property at issue, and neither forum appears substantially more or less convenient than the other. The third factor, which looks to the order in which jurisdiction was obtained and the relative progress of the two actions, weighs in favor of denying the stay. Maharaj waited until September 2, 2005, to file his motion in state court, well after briefing had been completed in this case and, indeed, less than six weeks before oral argument was scheduled in the appellate

20

court. We can discern no apparent reason for the delay. <u>Avena</u> was decided in early 2004, the President's memorandum issued in February of this year, and the Supreme Court dismissed certiorari in <u>Medellin</u> on May 23, 2005. Although under the facts of this dispute the relative timing of the two cases is a lesser consideration, this factor weighs in favor of denying the stay request.

The fourth factor, the desire to avoid piecemeal litigation, weighs far more heavily in favor of denying the request for a stay. Quite simply, we are not convinced that there is even a reasonable probability that the state court action will be resolved in such a way as to "moot" any of the issues currently before us. <u>See</u> <u>Jefferson County v. Acker</u>, 210 F.3d 1317, 1318 n.1 (11th Cir. 2000) (noting that the court had denied a stay of appellate proceedings because there did not appear to be a reasonable probability that any of the federal issues would be rendered moot by the state proceedings); <u>Am. Mfrs. Mut. Ins. Co. v. Edward D. Stone Jr. &</u> <u>Assoc.</u>, 743 F.2d 1519, 1524-25 (11th Cir. 1984) (reversing the district court's decision to enter a stay pending the resolution of state court litigation because the state action "probably will not resolve the issues pending in the federal litigation"); <u>see also</u> <u>Currie</u>, 290 F.3d at 11. The only way the proceedings before us could be resolved or rendered moot would be if the state court found that Maharaj is entitled to relief on the merits of his Vienna Convention claim <u>and</u> vacated his prior

21

conviction - - thereby completely obviating the need for us to consider his current appeal. There is no reasonable probability that will happen.

First, Florida's state courts are bound (just as we are) by the Supreme Court's decision in Breard v. Greene, 523 U.S. 371, 118 S. Ct. 1352, 140 L. Ed. 2d 529 (1998). In Breard, the Court unambiguously held that a habeas petitioner's Vienna Convention claim was procedurally barred in federal court because it was not raised in the state court proceedings. Id. at 375, 118 S. Ct. at 1354. The Court noted the well-recognized principle of international law that "absent a clear and express statement to the contrary, the procedural rules of the forum State govern the implementation of [a] treaty in that State." Id. The Supreme Court has not retreated from its position in Breard, and none of the recent developments cited to us call the holding of Breard into substantial question, let alone overrule Breard. Thus, there is no reasonable probability that Florida's state courts could find themselves free of the constraints of Breard, regardless of the I.C.J.'s holding in Avena.

Second, even if Florida's courts somehow found a way to consider the Vienna Convention claim in spite of the procedural default, it seems to us that claim would likely fail on the merits anyway. The Florida Supreme Court has already definitively held that an individual does not have standing to raise a claim

22

under the Vienna Convention, which constitutes an "agreement[] between countries, not citizens." Gordon v. State, 863 So. 2d 1215, 1221 (Fla. 2003); Maharaj III, 778 So. 2d at 959.

Although our case law is not binding upon a Florida state court, our precedent similarly supports the idea that the Vienna Convention does not confer judicially enforceable individual rights. In United States v. Duarte-Acero, 296 F.3d 1277 (11th Cir. 2002), we found that a criminal defendant could not seek to have an indictment dismissed based on an alleged violation of Article 36 of the Vienna Convention. Id. at 1281. As support, we cited to the preamble of the Convention itself, which "disclaims any intent to create individual rights, stating that its purpose 'is not to benefit individuals but to ensure the efficient performance of functions by consular posts.'" Id. at 1281-82 (quoting the Preamble to the Vienna Convention). We also noted several extra-textual sources, including the State Department's view "that the only remedies for a violation of the Vienna Convention are diplomatic, political, or derived from international law," and the fact that no party to the Vienna Convention had ever dismissed an indictment based on a violation of Article 36. Id. at 1282. Although our holding in Duarte-Acero was limited to the remedy sought in that case, which was dismissal of the indictment, the sources we used to support that holding seemingly prohibit any

individual remedy. The Preamble is clear; the Convention is not intended to benefit individuals. The State Department's interpretation of the treaty, which is entitled to our respect, see El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng, 525 U.S. 155, 168, 119 S. Ct. 662, 671, 142 L. Ed. 2d 576 (1999), is also unambiguous; the only remedies for a violation of the Vienna Convention are diplomatic, political, or derived from international law.

Because of the Supreme Court's clear holding in Breard that violations of the Vienna Convention are subject to procedural default rules and the decisions of the Florida Supreme Court that Article 36 does not confer judicially enforceable individual rights, we remain unpersuaded that there is a reasonable probability Maharaj will prevail in the parallel state litigation. We are keenly aware of the comity due state court proceedings and the resources wasted when two courts unnecessarily proceed along the same track and at the same time. Those powerful considerations, however, are not apparent in this habeas petition, and the chances of conflicting results or wasted resources are improbably small. The fourth factor weighs heavily in favor of denying Petitioner's request for a stay.

We are also aware that the Supreme Court has recently granted certiorari in two cases that raise issues under the Vienna Convention. See Sanchez-Llamas v. Oregon, —S. Ct.—, No. 04-10566 (Nov. 7, 2005); Bustillo v. Johnson,—S. Ct.—,

No. 05-51 (Nov. 7, 2005). That the Court has granted certiorari in cases that may provide the vehicle by which it <u>could</u> overrule <u>Breard</u> does not change our conclusion. For even if <u>Breard</u> were overruled, Maharaj would still be a long way from the relief he seeks. Before our case could be rendered moot, the Florida courts would first have to determine that the Supreme Court's potential ruling applied to cases on collateral review, then that the Vienna Convention provides an individual with a remedy (the treaty mentions none), and finally that the specific remedy necessary to nullify our case (a new trial) is available and appropriate under these facts. There is no reasonable probability Maharaj will successfully navigate around each of these substantial hurdles.

The fifth factor - - whether federal law provides the rule of decision - - does not weigh heavily in either direction, since the questions presented involve both state and federal law. Finally, the sixth factor, which asks whether the state court will adequately protect the rights of all parties, is similarly unavailing under the facts of this case.

Accordingly, we decline the invitation to stay our hand in favor of the recently filed state proceeding. This case was originally tried some seventeen years ago in 1987, making the time for finality long overdue. We proceed to the merits of this habeas petition.

25

## IV.

When examining a district court's denial of a § 2254 habeas petition, we review questions of law and mixed questions of law and fact de novo, and findings of fact for clear error. LeCroy v. Sec'y, Fla. Dep't of Corr., 421 F.3d 1237, 1259 (11th Cir. 2005). However, in reviewing the decisions of the Florida Supreme Court, we are governed by the terms of AEDPA, which provides, among others, that we may grant a writ of habeas corpus only if (1) the state decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) the state decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The district court concluded that Maharaj failed to meet this exacting standard. We agree.

The phrase "clearly established Federal law," as used in § 2254(d)(1), encompasses only the holdings of the Supreme Court of the United States. Williams v. Taylor, 529 U.S. 362, 412, 120 S. Ct. 1495, 1523, 146 L. Ed. 2d 389 (2000) (holding that the language of § 2254(d)(1) expressly "restricts the source of clearly established law to [the Supreme Court's] jurisprudence"). As we have previously explained,

> § 2254(d)(1) provides a measuring stick for federal habeas courts
> reviewing state court decisions.  That measuring stick is "clearly
> established Federal law."  28 U.S.C. § 2254(d).  Clearly established
> federal law is *not* the case law of the lower federal courts, including
> this Court.  Instead, in the habeas context, clearly established federal
> law "refers to the holdings, as opposed to the dicta, of [the Supreme
> Court's] decisions as of the time of the relevant state court decision."
> Williams, 529 U.S. at 412, 120 S. Ct. at 1523.

Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001) (footnote omitted).

Moreover, section 2254(d)(1) provides two separate bases for reviewing state court decisions; the "contrary to" and "unreasonable application" clauses articulate independent considerations a federal court must consider.  See Williams, 529 U.S. at 404-05, 120 S. Ct. at 1519; Henderson v. Campbell, 353 F.3d 880, 890 n.15 (11th Cir. 2003), cert. denied, 125 S. Ct. 44 (2004).  A state court decision is contrary to clearly established federal law if either "(1) the state court applied a rule that contradicts the governing law set forth by Supreme Court case law, or (2) when faced with materially indistinguishable facts, the state court arrived at a result different from that reached in a Supreme Court case."  Putman, 268 F.3d at 1241.  An "unreasonable application" of clearly established federal law may occur if the state court "identifies the correct legal rule from Supreme Court case law but unreasonably applies this rule to the facts of the petitioner's case."  Id.  "An unreasonable application may also occur if a state court unreasonably extends, or

27

unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." Id.

Section 2254(d)(2) provides an additional basis upon which a federal court may grant a writ of habeas corpus to a state prisoner: when the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). A state court's determination of the facts, however, is entitled to substantial deference. 28 U.S.C. § 2254(e)(1) (noting that "a determination of a factual issue made by a State court shall be presumed to be correct" and that an "applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence"). With these principles in mind, we review the merits of Petitioner's Brady claims, his ineffective assistance of counsel claim, and his Vienna Convention claim.

## V.

First, Maharaj suggests that state prosecutors violated Brady by failing to disclose: 1) the results of Neville Butler's polygraph examination; 2) the contents of the Moo Youngs' briefcase; and 3) the Moo Youngs' life insurance policies.

In Brady v. Maryland, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97, 10 L. Ed. 2d 215 (1963), the Supreme Court enunciated the now well-established principle

28

that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process when the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." The duty to disclose exculpatory evidence is applicable even in the absence of a request by the defendant, and it encompasses impeachment material as well as exculpatory evidence. See Strickler v. Greene, 527 U.S. 263, 280, 119 S. Ct. 1936, 1948, 144 L. Ed. 2d 286 (1999). Moreover, evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Kyles v. Whitley, 514 U.S. 419, 433-34, 115 S. Ct. 1555, 1565, 131 L. Ed. 2d 490 (1995) (internal quotation marks and citations omitted). The Supreme Court has condensed these basic principles into three components, each of which is necessary to establish a Brady violation: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Strickler, 527 U.S. at 281-82, 119 S. Ct. at 1948.

A constant theme found throughout Maharaj's appeal is that the district court erred in so far as it considered the various Brady violations individually, and not acting in concert. In Kyles, the Supreme Court made clear that a Brady materiality

29

determination must consider the aggregate effect of all the suppressed evidence. Kyles, 514 U.S. at 436, 441, 115 S. Ct. at 1567, 1569.  That does not mean, however, that an individual assessment of each piece of suppressed evidence is somehow inappropriate.  Indeed, the only way to evaluate the cumulative effect is to first examine each piece standing alone.  See id. at 436 n.10, 115 S. Ct. at 1567 n.10 (noting that "[w]e evaluate the tendency and force of the undisclosed evidence item by item; there is no other way.  We evaluate its cumulative effect for purposes of materiality separately and at the end of the discussion . . . .").  We have followed this approach in our own cases.  See, e.g., Kelley v. Sec'y for the Dep't of Corr., 377 F.3d 1317, 1355, 1369 (11th Cir. 2004), cert. denied, 125 S. Ct. 2962 (2005); Zeigler v. Crosby, 345 F.3d 1300, 1305-06 (11th Cir. 2003).  In this case the district court followed the appropriate methodology, considering each Brady item individually, and only then making a determination about the cumulative impact. We do the same.

## A.    Neville Butler's Polygraph

The first Brady claim relates to a polygraph exam taken by the government's principle witness, Neville Butler.  Maharaj contends that the State did not disclose the polygraph examiner's written report that details his conclusions regarding Butler's truthfulness.  The record reveals that after Butler was initially deposed, the

30

State asked him to sit for a polygraph examination. The polygrapher asked Butler questions about the events leading up to the murders, what actually happened in the hotel room, and what occurred after Butler and Maharaj left the hotel room. All told, Butler was asked eleven questions.[3]

In his written report, the examiner concluded that Butler was truthful in answering eight of the eleven questions. As for questions four and six, concerning whether Butler knew Derrick Moo Young was going to be shot before the incident occurred and whether Butler told the complete truth about the shooting incident, the examiner opined that the results were ambiguous and inconclusive. Finally, as to question ten - - whether Maharaj remained in a car for two and a half hours following the shooting - - the examiner concluded that Butler's response was indicative of deception. In the opinion of the examiner, however, Butler truthfully

---

[3]The eleven questions were: 1) Did you actually witness that shooting? (Answer – yes); 2) On, or about, October 16, 1986 did you actually see Chris (sic) Maharaj shoot Derrick Moo Young? (Answer – yes); 3) On October 16th did you have knowledge that Maharij (sic) had a gun in his possession before Derrick Moo Young entered the room? (Answer – No); 4) On October 16th did you have actual knowledge that Moo Young was going to be shot before it happened? (Answer – No); 5) On October 16, did you have a gun or any other weapon in your possession at any time before Derrick Moo Young was shot? (Answer – No); 6) To the best of your ability have you now told the complete truth regarding the shooting incident on October 16, 1986? (Answer –Yes); 7) Did Maharaj ask you to arrange a meeting between himself and Derrick Moo Young? (Answer – Yes); 8) On October 16, 1986 did you personally arrange the meeting between Derrick Moo Young and Chris (sic) Maharaj? (Answer – Yes); 9) Other than what you have explained was anyone else present when the Moo Youngs were shot? (Answer – No); 10) Did you actually remain in a car with Maharaj after the shooting for at least two and a half hours? (Answer – Yes); 11) Was illegal drug transactions to be discussed at the meeting between Maharaj and Derrick Moo Young? (Answer – No).

answered each question that related to the actual events that occurred in the hotel room during the confrontation between Maharaj and the Moo Youngs and to the actual shootings.

The State did not produce the examiner's opinion to Maharaj. It did, however, send a letter to the defendant before trial that stated:

> As you are aware, the State's eyewitness to this homicide, Neville Butler, has been polygraphed with reference to his knowledge of what transpired in the Dupont Plaza Hotel, room number 1215, on October 16, 1986. As I indicated to you previously, he passed with regard to the questions asked of him as to your client being the shooter in this matter as well as he not being armed or participating in the shootings of the Moo Youngs. However, questioning of Mr. Butler, prior to his polygraph examination and subsequent thereto, has resulted in my obligation under Florida Rules of Criminal Procedure 3.220, to inform you that Mr. Butler had some material corrections and additions to make to the deposition testimony he has previously rendered to you. Therefore, please consider this letter as compliance with my obligation for continuing discovery and an invitation to you to redepose Mr. Butler at your convenience regarding events which occurred prior to the homicide as well as post-homicide.

Counsel for Maharaj did redepose Butler, at which time Butler admitted that he lied to police when he gave an initial statement and lied in his first deposition. Essentially, Butler conceded that he lied to police about his role in setting up the murders and about events that happened after the murders in an attempt to lessen his own involvement. Butler did not want to admit to police that he arranged for the meeting between Maharaj and the Moo Youngs at the Dupont Plaza Hotel, so

32

he originally lead the police to believe that Maharaj unexpectedly arrived at the hotel room.  In fact, counsel for Maharaj cross-examined Butler extensively at trial on this point, and got him to admit on numerous occasions that he had repeatedly lied under oath in the course of this case.  However, Butler's testimony describing the actual events that occurred in the hotel room - - that portion of the story beginning when Maharaj walked into the room and ending when Maharaj and Butler exited to the elevator - - remained consistent from his very first statement to the police through his testimony at trial.

Petitioner contends, nevertheless, that he should have been given the examiner's opinion.  He asserted this claim on direct appeal and throughout the post-conviction proceedings.  Maharaj does not argue that he was prevented at trial from introducing the examiner's opinion; indeed, Florida law prohibits the introduction of polygraph results absent the consent of both parties, see Walsh v. State, 418 So. 2d 1000, 1002 (Fla. 1982), and the trial judge in this case specifically prohibited the witness from making any mention of the polygraph in the course of his testimony.  Instead, Maharaj suggests that if he had known about the results of the test, he could have impeached Butler concerning why he decided to come clean and testify truthfully.  Butler says he did so because his conscience

33

compelled him to tell the truth; Petitioner urges that it was because he was afraid of taking a polygraph test or because he knew he had failed the polygraph test.

On collateral review of the murder conviction, the Florida Supreme Court correctly recited the three components of a Brady violation as set forth by the Supreme Court in Strickler.  Maharaj III, 778 So. 2d at 953.  It then found that there was no Brady violation because the defense had knowledge of the polygraph results and because Butler had not actually "failed" the test.

As for the finding that the defense had knowledge of the polygraph results, the district court noted that there was substantial evidence in the post-conviction record to indicate that the defense was not aware of the fact that Butler's answer to one of the questions was indicative of deception.  But, the district court observed that even if it were to disagree with the Florida Supreme Court's conclusion, the state high court's finding was not an unreasonable one.

We agree.  Initially, we note that the Florida Supreme Court did not apply a rule that contradicts governing Supreme Court case law.  Moreover, we can find no Supreme Court case whose facts could be considered "materially indistinguishable."  Thus, the Florida Supreme Court's decision was not "contrary to" clearly established federal law.  Furthermore, the Florida Supreme Court's decision was not an "unreasonable application" of clearly established federal law.

34

Although there is no evidence to indicate that the State actually provided Petitioner with a copy of the examiner's opinion, it did inform Petitioner that the test occurred, that Butler truthfully answered the questions concerning the events in the hotel room, including the circumstances surrounding the shooting, that Butler had "material corrections and additions" to make to his previous deposition testimony, and that defense counsel might want to redepose Butler regarding events that occurred before and after the homicide. Defense counsel was free to ask Butler why he changed his story and to vigorously cross-examine him concerning the inconsistencies. The Florida Supreme Court's analysis under Brady was neither contrary to nor an unreasonable application of clearly established federal law.

Maharaj suggests, however, that he did not want the polygraph results so that he could publish the results to the jury. Rather, he claims the results support his theory that Butler changed his story when he was summoned to face a lie detector test, and that he only changed his story when caught lying by the polygrapher. When viewed in this light, Petitioner's claim must also be analyzed as a potential Giglio error, a type of Brady violation that occurs when "the undisclosed evidence demonstrates that the prosecution's case included perjured testimony and that the prosecution knew, or should have known, of the perjury."

United States v. Agurs, 427 U.S. 97, 103, 96 S. Ct. 2392, 2397, 49 L. Ed. 2d 342 (1976).

"In order to prevail on a Giglio claim, a petitioner must establish that the prosecutor knowingly used perjured testimony, or failed to correct what he subsequently learned was false testimony, and that the falsehood was material." Tompkins v. Moore, 193 F.3d 1327, 1339 (11th Cir. 1999) (internal quotation marks and citation omitted) (emphasis added). The Florida Supreme Court correctly noted this standard, Maharaj III, 778 So. 2d at 956, and went on to reject Petitioner's claim "because the defendant has failed to demonstrate that the statement was false or that the statement was material." Id. at 957.

In explaining why Butler's testimony was not false, the Florida Supreme Court said:

> While the statement concerning an act of conscience may not be entirely true, there has been no showing that it was entirely false. The prosecutors testified at the evidentiary hearing that Butler voluntarily appeared at their office after being told that the State wanted to question him about some of his testimony. He was not given immunity and changes were made to the testimony prior to the polygraph. Neither prosecutor indicated that Butler changed any testimony as a result of the polygraph examination. The State opined Butler may have considered his change of testimony voluntary because he voluntarily appeared for further questioning.
>
> Based on this record, the State did not suborn perjury.

Id.

36

Again, we can find no Supreme Court case with materially indistinguishable

facts.  See Ventura v. Attorney Gen., 419 F.3d 1269, 1281 (11th Cir. 2005) (noting

that a Giglio analysis is a "highly fact-dependent inquiry").  Moreover, the Florida

Supreme Court did not apply a rule that contradicts Supreme Court case law.  The

state court decision was not "contrary to" clearly established federal law on this

point either.  As for the application of that correctly-stated law, we have little

difficulty concluding that it was reasonable for the Florida Supreme Court to find

that Maharaj failed to establish that Butler's trial testimony was false.  At trial,

Butler testified in these terms:

> Q: How is it that you decided to tell the truth about your own
> involvement in early March of 1987?
>
> A: My consideration was the main factor is that I felt I was holding
> back when I shouldn't be and I remember that I called to come down
> to speak with your office and before I was able to start telling you,
> you started telling me that I had to ask for an appointment and then I
> came to tell you and as it happened, you started to question me and
> tell me that I had lied and I just told you the whole story, it was my
> consideration and you all persisted with your inquiry.
>
> . . .
>
> Q (On Cross-Examination): But it doesn't bother you to lie after
> having been sworn under oath to tell the truth, that's correct, right?
>
> A: I explained earlier last week the circumstances under which I felt I
> was protecting myself and the reasons for the things I said and I
> voluntarily agreed to correct the wrongs I had - - statements I had

37

made when I approached the District Attorney, State Attorney and told him about it.

There is nothing to indicate the reasons offered for Butler's decision to come clean were other than what he said at trial. Petitioner's belief that the decision to tell the truth was based on a fear of the lie detector test or perhaps fear of the results of that test is speculative. In the Giglio context, the suggestion that a statement may have been false is simply insufficient; the defendant must conclusively show that the statement was actually false. See Moon v. Head, 285 F.3d 1301, 1315 (11th Cir. 2002); Brown v. Head, 272 F.3d 1308, 1317-18 (11th Cir. 2001). The Florida Supreme Court's determination that Butler's stated reason for changing his testimony was not false was neither contrary to nor an unreasonable application of clearly established federal law.

Moreover, the Florida Supreme Court determined that the statement was not material, finding that the failure to clarify Butler's reason for the change of testimony would not have affected the jury's verdict. See Maharaj III, 778 So. 2d at 957. The district court agreed, finding that

> [i]n this instance, there is no reasonable likelihood that the revelation that Butler's change in testimony may not have been based entirely on his own initiative would have affected the judgment of the jury. The important aspect of the change in story was that Butler had shown that he was willing to lie under oath, that he had lied because of concern regarding how his involvement would be regarded by the prosecutors, and that he had told inconsistent stories at various times. That is, it

38

was primarily Butler's change in testimony, rather than the impetus for the change, that would have been important to the jury, and this was all effectively brought out in cross-examination and closing arguments. Moreover, if he did in fact change his story only because of the polygraph examination, that jury never would have learned this, since the judge had specifically warned Butler against mentioning the polygraph exam during his testimony.

We agree with the Florida Supreme Court and the district court that, even if Maharaj had established that Butler's testimony was false (which he did not), the falsehood was not material. Butler was thoroughly and vigorously cross-examined about the inconsistencies in his accounts, and Maharaj's counsel elicited testimony from Butler that he had lied under oath. Moreover, Maharaj's trial counsel was not prevented from asking Butler why he changed his story; indeed, he asked him that very question in the second deposition. There is no reasonable likelihood that the revelation that Butler's change in testimony may not have been based entirely on his own initiative could have affected the judgment of the jury. See Ventura, 419 F.3d at 1277-78 (noting that a statement is material under Giglio if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury). The Florida Supreme Court's resolution of Maharaj's claims concerning the polygraph report, under both Brady and Giglio, was neither contrary to nor an unreasonable application of clearly established federal law.

39

**B.  The Moo Youngs' Briefcase**

Maharaj next claims that the state prosecutors violated Brady when they failed to turn over the contents of a briefcase, containing passports and various documents, that the Moo Youngs brought with them to the Dupont Plaza Hotel. The briefcase was taken by the police as evidence and subsequently returned to the victims' family.  An investigator working for Petitioner's trial counsel subsequently asked the police to produce the briefcase and its contents.  The police responded that they no longer had the briefcase and informed the investigator that it had been returned to the Moo Young family.  Petitioner contends that the items contained in the Moo Youngs' briefcase should have been turned over as Brady material.

The state post-conviction trial court described the contents of the briefcase as passports for both Duane and Derrick Moo Young, showing travel to Panama, Jamaica, and other countries, international letters of credit, appointments, insurance policies on the victims, and other documents that might suggest the victims may have been involved in transactions involving very large sums of money, and, potentially fraudulent activities.  Petitioner contends that these passports and documents would have led to other evidence, which in turn may have

shown that the Moo Youngs were killed by a Colombian cartel for trying to siphon millions of dollars while laundering drug money around the Caribbean.

The state post-conviction trial court rejected this claim, finding that there was no Brady violation for two independent reasons: first, the briefcase and its documents were not suppressed by the State because Petitioner knew of their existence and had the power to compel their return from the Moo Young family by subpoena, and, second, the information was not material. The Florida Supreme Court affirmed on those same grounds. We agree.

Again, the Florida Supreme Court correctly articulated the Brady standard. The trial court did likewise, citing the Supreme Court's decision in Kyles. In this case, the defense was plainly aware that the Moo Youngs left a briefcase at the crime scene; an investigator working for Petitioner's counsel approached the police and asked them for it. The officer explained, however, that the briefcase had been returned to the victims' family. At that time, Petitioner knew of the briefcase and knew how he could obtain it. The police could not give it to him because they no longer had it.

Our case law is clear that "[w]here defendants, prior to trial, had within their knowledge the information by which they could have ascertained the alleged Brady material, there is no suppression by the government." United States v. Griggs, 713

41

F.2d 672, 674 (11th Cir. 1983); accord LeCroy, 421 F.3d at 1268 (noting that there

was no Brady violation because the defendant could have obtained the information

had he used "reasonable diligence"); Haliburton v. Sec'y for Dep't of Corr., 342

F.3d 1233, 1239 (11th Cir. 2003); United States v. Valera, 845 F.2d 923, 927-28

(11th Cir. 1988); United States v. Cortez, 757 F.2d 1204, 1208 (11th Cir. 1985).

The evidence was not suppressed by the state.[4]

Moreover, we agree with the state court that neither the briefcase nor its

contents were material. In describing why the briefcase documents were not

material, the state post-conviction trial court observed that the documents would

not have impeached the star witness, Neville Butler, nor refuted testimonial

evidence taken from the hotel employees, the fingerprint evidence tying Maharaj to

the hotel room, or the ballistics evidence regarding Maharaj's gun. The state court

not only found that there was no reasonable probability the proceedings would

---

[4]Nor is this case at all like the Supreme Court's decision in Banks v. Dretke, 540 U.S. 668, 124 S. Ct. 1256, 157 L. Ed. 2d 1166 (2004), where the Court cautioned that "[a] rule . . . declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process." Id. at 696, 124 S. Ct. at 1275. In Banks, the prosecutors failed to disclose that a key witness was a paid police informant, and stood by as that witness affirmatively testified to the contrary. The Court rejected the State's argument that the defendant could have more diligently pursued the police officer involved, and in doing so might have discovered the witness' status. The Court summarized the State's argument as one where "'the prosecution can lie and conceal and the prisoner still has the burden to . . . discover the evidence.'" Id. (citing the oral argument transcript) (alteration in original). In contrast, in this case, the prosecution did not physically possess the documents Petitioner sought, and it made no false or misleading statements regarding what that evidence might show or where it might be found. Indeed, the police unambiguously directed the investigator to where he might obtain the evidence. When the defendant has "equal access" to the evidence disclosure is not required.

42

have been different if the evidence had been disclosed, but went so far as to say that disclosure would not have resulted in a markedly weaker case for the prosecution or a markedly stronger one for the defendant.

The Florida courts' application of the Brady rule was reasonable here too. In deciding whether evidence was material for the purposes of a Brady violation, the question is not whether the conviction was "more likely" because the evidence was introduced or even whether the evidence "might have changed the outcome of the trial." Strickler, 527 U.S. at 289, 119 S. Ct. at 1952. Rather, Petitioner "must convince us that 'there is a reasonable probability' that the result of the trial would have been different if the suppressed documents had been disclosed to the defense." Id. The word "reasonable" "is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Kyles, 514 U.S. at 434, 115 S. Ct. at 1566.[5]

---

[5]The Supreme Court's decision in Strickler is instructive. In Strickler, the documents withheld consisted of police interview notes and correspondence between detectives and the state's primary trial witness. The Court held that the documents were not material, finding that the defendant would have been convicted and sentenced to death even if the testifying witness had been severely impeached. Strickler, 527 U.S. at 294, 119 S. Ct. at 1954. Here, the contents of the briefcase are not nearly as informative or exculpatory as the documents in Strickler.

We agree with the state post-conviction trial court that the briefcase documents neither impeached Butler's testimony nor called into question any of the physical evidence recovered from the crime scene. At most, they arguably cast the victims in a negative light and raise the bare possibility that the Moo Youngs may have been involved in some arguably unsavory activities with other individuals who may have had reason to do them harm. This highly speculative chain falls far short of even that quantum of evidence rejected as being insufficient by the Strickler Court, and, at all events, does not establish a reasonable probability that the result of the trial would have been different if the documents had not been suppressed. See Crawford v. Head, 311 F.3d 1288, 1330-31 (11th Cir. 2002) (rejecting an argument similar to the one Petitioner makes here, finding that a police report detailing clothing found at a crime scene was not material, despite the fact that the report could theoretically give rise to the theory that other potential suspects should have been more thoroughly investigated).

The Florida courts' twin conclusions that the briefcase contents were not suppressed by the state and were not material under Brady were reasonable, and were neither contrary to nor an unreasonable application of clearly established federal law. Maharaj is entitled to no relief on this claim.

44

**C.     The Moo Youngs' Life Insurance Policies**

Finally, Maharaj alleges that the State withheld evidence the Moo Youngs had recently purchased large life insurance policies.  The Florida Supreme Court found, however, that the policies, which were taken out several months before the murders, were not exculpatory because "there has been no showing that this evidence tends to negate the conviction or the sentence," and "[m]ore importantly," that the disclosure of the policies would not have put the case in so different a light as to undermine confidence in the verdict.  Maharaj III, 778 So. 2d at 953-54.  The district court agreed, concluding that the evidence was not exculpatory, that any arguments based on that evidence (or other evidence that may have been discovered as a result of knowing about the policies) was too speculative to have altered the outcome, and that it could not have been used to impeach the State's primary witnesses.

Our analysis concerning the life insurance policies is similar to the one that governed the contents of the Moo Youngs' briefcase.  Maharaj's argument, that the Moo Youngs were involved in shady dealings to the point that they were concerned about their own well-being, and, therefore, executed substantial life insurance policies, is even more speculative than his argument concerning the other contents of the briefcase.  The existence of the insurance policies in no way refutes

45

any of the physical evidence and does not impeach any of the State's witnesses. The Florida Supreme Court's resolution of this Brady claim was altogether reasonable.

The state post-conviction trial court also considered the cumulative effect of the evidence, and found that there was no reasonable probability that had the evidence been disclosed to the defense, the result of the proceedings would have been different. The district court agreed and so do we.

We have carefully reviewed the Brady items and readily conclude that there is no reasonable probability, had all of the items been disclosed to the defense, the result of the proceedings would have been any different. There was ample evidence of motive, and significant physical evidence tying Petitioner to the room where the murders occurred. The State's eyewitness, Neville Butler, never wavered as to the most important part of his testimony, describing Maharaj's brutal attacks on the Moo Youngs, and that testimony was corroborated by physical and ballistic evidence. None of the alleged Brady items calls into question that portion of Butler's testimony, and none refutes any of the physical evidence. Moreover, Neville Butler was significantly impeached by Petitioner's trial counsel, who extracted numerous admissions from Butler concerning the lies he told at various points throughout this case. Again, the Florida courts' disposition of this claim

46

was neither contrary to nor an unreasonable application of clearly established federal law.

## VI.

Maharaj did not testify at trial. Nevertheless, he argues that this decision was based at least in part on the ineffective assistance of trial counsel. At the state post-conviction hearing, trial counsel testified that he met with Maharaj on a daily basis to discuss strategy, and specifically, the pros and cons of whether Maharaj should testify in his own defense. Trial counsel fully explained to Petitioner his right to testify, and expressed his own opinion that Maharaj should forgo that right. Trial counsel plainly told Maharaj that if he testified, he would be subject to extensive cross-examination concerning the newspaper articles published by Mr. Carberry, which contained various allegations about Maharaj, including those underlying his dispute with the Moo Youngs. Specifically, trial counsel testified that "I advised [Maharaj] that in my opinion he should not testify, that it would only allow the state to argue the innuendo and speculation and I felt it was in his best interest not to take the stand."

At the time trial counsel advised Petitioner, he was under the impression that Maharaj had two outstanding warrants in Great Britain, both of which were

47

allegedly mentioned in newspaper articles. It now appears that the warrants had been resolved at the time trial counsel provided his advice. Maharaj says that trial counsel was ineffective in failing to discover that the warrants had been resolved and that he would have testified had he been provided with competent advice.

The standards for ineffective assistance of counsel are well-established, and were correctly noted by the Florida courts. In Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the Supreme Court established that to prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate both that counsel's performance was deficient and that the deficient performance prejudiced the defense. Id. at 687, 104 S. Ct. at 2064. As for the deficiency prong, a petitioner must demonstrate that counsel's performance "fell below an objective standard of reasonableness." Id. at 688, 104 S. Ct. at 2064. A reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Id. at 689, 104 S. Ct. at 2065 (internal quotation marks and citation omitted). And, to satisfy the prejudice prong, the defendant must demonstrate that "there is a reasonable probability that,

48

but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S. Ct. at 2068.

The Florida Supreme Court found that Petitioner failed to establish either deficiency or prejudice. The court noted as significant that Maharaj did not testify at the state post-conviction hearing, and, therefore, presented no testimony showing that the articles were false or why that fact would have changed his decision. "More importantly, even assuming the falsity of the articles, Maharaj does not negate the fact that he would have been cross-examined on whether the articles made him angry, which is the reason they were relevant." Maharaj III, 778 So. 2d at 958.

As the district court observed, the Florida Supreme Court's decision was based on its finding that even if the warrants were not outstanding and the newspaper articles were false, trial counsel's main concern was that Petitioner would be extensively cross-examined about how the articles made him feel and how they may have given him reason to dislike the Moo Youngs. This conclusion is amply supported by trial counsel's testimony at the post-conviction hearing, and is left wholly unrefuted.

In undertaking this analysis, the Florida Supreme Court did not apply a rule that contradicts Supreme Court case law, nor did it arrive at a result contrary to one

49

reached by the Supreme Court in a case with materially indistinguishable facts. Additionally, the state court's application of that correctly-stated law was altogether reasonable. See Darden v. Wainwright, 477 U.S. 168, 185-86, 106 S. Ct. 2464, 2474, 91 L. Ed. 2d 144 (1986) (holding that because there were "several reasons" why counsel might have made a particular decision, petitioner had failed to overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy). The tactical decision to advise petitioner against testifying because of the dangerous cross-examination that could ensue was utterly unaffected by the truth or falsity of the articles and cannot be a sound basis for a claim of ineffective assistance of counsel. See McNeal v. Wainwright, 722 F.2d 674, 676 (11th Cir. 1984) (noting that "[c]ounsel will not be deemed unconstitutionally deficient because of tactical decisions"). Maharaj has failed to show that "no competent counsel would have taken the action that his counsel did take," Chandler v. United States, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc).

There is little discussion in the Florida Supreme Court's decision concerning prejudice, and we need not reach that issue here, since Petitioner's claim must fail if either of the Strickland prongs are not met. See Strickland, 466 U.S. at 697, 104 S. Ct. at 2069; Turner v. Crosby, 339 F.3d 1247, 1279 (11th Cir. 2003).

## VII.

Finally, Maharaj contends that his rights were violated when he was not informed after his arrest that he had the right to contact the British consulate pursuant to the Vienna Convention and the United Kingdom Bilateral Consular Treaty, June 6, 1951, 3 U.S.T. 3426 ("The Bilateral Treaty").[6] The Florida Supreme Court found that Petitioner was procedurally barred from raising this claim in collateral proceedings because he had failed to raise it on direct appeal. In the district court, Petitioner argued that the Florida Supreme Court erred in resolving the claim on procedural default grounds, citing a case from the I.C.J., LaGrand Case (Germany v. United States), 40 I.L.M. 1069 (I.C.J. June 27, 2001).[7] The district court found that although the Florida court did not directly cite Breard, it correctly followed the Supreme Court's directive in that case.

---

[6]Petitioner treats the two treaties identically. In his brief, he indicates that any reference to the Vienna Convention should be treated as a reference to both. In an amicus brief, the Government of the United Kingdom of Great Britain and Northern Ireland presents discussion of only The Bilateral Treaty. However, it cites no cases with any substantive discussion of the Bilateral Treaty; the only cases cited with a substantive discussion of either refer to only the Vienna Convention. Neither the Florida Supreme Court nor the district court differentiated between the two. And, we have been unable to locate any case law comparing the two treaties. Accordingly, we assume, without deciding, that the two treaties should be treated in a similar fashion.

[7]Avena was not decided until after Petitioner had completed his briefing in the district court. Thus, although it was not cited in Petitioner's filings, it was referenced in the district court's order.

Maharaj makes similar arguments on appeal: that the I.C.J. is the "ultimate arbiter" of disputes under the Vienna Convention, and that the Florida Supreme Court's decision is contrary to Avena and LaGrand, both of which he describes as "controlling" authority. We remain unpersuaded.

In the first place, the Florida Supreme Court's decision is not contrary to clearly established federal law; that court did not arrive at a result different from one reached by the Supreme Court in a case with materially indistinguishable facts, and it did not apply a rule that contradicts governing Supreme Court precedent. Indeed, the decision is completely consonant with the Supreme Court's decision in Breard, where, as we have noted already, the Supreme Court clearly held that a petitioner who had failed to raise his Vienna Convention claim in state post-conviction proceedings was barred from doing so in federal court. Breard, 523 U.S. at 375, 118 S. Ct. at 1354 (rejecting the argument that the Vienna Convention is the "supreme law of the land," and therefore trumps procedural bars, as "plainly incorrect").

Breard did not involve an identical fact pattern to the case at bar. In Breard, the defendant raised the Vienna Convention claim for the first time in federal court, having failed to do so at trial or before the state post-conviction court. Here, Petitioner brought his claim for the first time before the state post-conviction court,

52

having failed to do so before the state trial court. There is nothing in Breard, however, to suggest that the timing of the procedural default has any significance. The Court's holding that a Vienna Convention claim must be raised in conformity with both the laws of the United States and the laws of the state of conviction, see id., means that a procedural bar can apply no matter when that bar occurred.

Petitioner directs us to the cases of Avena and LaGrand, where the I.C.J. held that it was error to dispose of a claim under the Vienna Convention by use of a procedural bar. Petitioner cites no authority, however, for the proposition that precedent from the I.C.J. is binding upon this or any other state or federal court in the United States. Unsurprisingly, we were unable to find any controlling case law permitting us to ignore the rulings of the Supreme Court of the United States in favor of one from an international tribunal. Because Petitioner failed to raise his claim in conformity with the laws of the State of Florida, the Florida Supreme Court did not arrive at a result contrary to Supreme Court precedent. For similar reasons, the Florida Supreme Court's decision was not an unreasonable application of clearly established federal law.[8]

---

[8]The Florida Supreme Court did not specifically cite Breard. However, a state court need not cite to, nor even be aware of Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 365, 154 L. Ed. 2d 263 (2002).

53

## VIII.

The district court's COA was limited to six issues, and we decline petitioner's invitation to consider any others. Moreover, there is no reasonable probability that Petitioner's newly filed state action will resolve or moot the issues pending before us, and we deny his request for a stay. As for the merits of Petitioner's claims, the Florida Supreme Court's decision was neither contrary to nor an unreasonable application of clearly established federal law, and, therefore, we affirm in all respects the decision of the district court.

**AFFIRMED**.