[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-11832

_____

D.C. Docket No. 3:09-cv-00099-TJC-JBT


JOEL DALE WRIGHT,

Petitioner-Appellant,

versus

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,
ATTORNEY GENERAL, STATE OF FLORIDA,

Respondents-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(August 4, 2014)

Before ED CARNES, Chief Judge, HULL and WILSON, Circuit Judges.

HULL, Circuit Judge:

Joel Dale Wright, a Florida inmate, filed a 28 U.S.C. § 2254 petition for a

writ of habeas corpus, raising multiple challenges to his capital conviction and

death sentence. The district court denied Wright's petition, but granted a certificate of appealability ("COA") as to two guilt phase claims, alleging Brady[1] violations and ineffective trial counsel, and one death sentence claim, involving an invalid aggravating circumstance.

Having considered the state court record, the district court's thorough order, and the parties' submissions, and with the benefit of oral argument, we affirm the district court's denial of Wright's § 2254 petition.

## I.  STATE'S GUILT PHASE EVIDENCE, 1983

In 1983, petitioner Wright lived with his parents in Palatka, Florida, next door to Lima Paige Smith, a 75-year-old school teacher. Sometime during the night of Saturday, February 5, Wright entered Ms. Smith's home, stole her money, beat her about the head and face, obtained a knife, raped her brutally and savagely, and then stabbed her face and neck twelve times, resulting ultimately in Ms. Smith drowning in her own blood.

Around noon on Sunday, February 6, Earl Smith, Ms. Smith's brother and neighbor, went to her door and knocked, and no one answered. He tried again over the course of several hours. Eventually, Earl Smith entered through an open window in the rear of Ms. Smith's house. He found his sister's body lying on the floor of her bedroom in a six-inch gap between the bed and a wall. Ms. Smith's

---

[1]Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963).

"dress was pulled up above her waist, and she had no clothing on under that, and she was bloody." Earl immediately called the Sheriff's Office. The call came in at 4:15 PM. Deputy Joe Cobb was dispatched at 4:17 and arrived at 4:24 PM.

During the trial, the State called 34 witnesses. We recount the testimony of seven of the State's key witnesses most relevant to this appeal.[2]

## A.     Medical Examiner William Latimer

Dr. William Latimer, the medical examiner, testified about the brutal killing of Ms. Smith. At around 9:00 PM on Sunday, February 6, Dr. Latimer received Ms. Smith's body and conducted an autopsy.

Dr. Latimer observed: (1) bruises on her face, particularly the right side; (2) 12 stab wounds on the left side of her neck and face, the largest wound being two inches long; and (3) a laceration in her vagina with blood trickling down the inner part of her right leg and extensive hemorrhaging. Dr. Latimer described the wound to her vaginal area as "[v]ery serious" and determined that it occurred before Ms. Smith died. As for the stab wounds, Dr. Latimer speculated that they were inflicted by a pocketknife. Ms. Smith died as a result of "multiple stab wounds which produced a state of shock and caused bleeding into the lungs and resulted in death."

---

[2]The State's 34 witnesses included 8 law enforcement officers, forensic examiners, Palatka residents, and individuals who interacted with Wright during the period before and after Ms. Smith's murder. Notably, Wright's father testified during the State's case that Wright was not at home the night of the murder.

3

As to the time of Ms. Smith's death, Dr. Latimer stated that, assuming that Ms. Smith maintained normal eating and sleeping habits, her death likely occurred between 5:00 and 9:00 PM on Saturday, February 5.  He thought so because: (1) when Ms. Smith's body arrived at the morgue, around 9:00 PM on Sunday, rigor mortis had already set in, indicating she was dead between 12 and 24 hours; (2) she was last seen alive around 5:00 PM on Saturday, February 5; (3) her stomach was empty, indicating she had not yet had her evening meal when she died; and (4) her body was not dressed in bed clothing, indicating she had not yet gotten ready for bed at the time of her murder.  Dr. Latimer acknowledged he did not know anything about Ms. Smith's eating and sleeping habits and could only speculate as to the precise time of death.

Thus, under Dr. Latimer's testimony, Ms. Smith died between 5:00 and 9:00 PM on Saturday if she maintained normal eating and sleeping habits.  If she did not have normal habits, then, under his rigor mortis timeframe, she died between an expanded time frame from Saturday night until 9:00 AM on Sunday (12 hours before the autopsy at 9:00 PM).[3]

---

[3]During the trial, Dr. Latimer testified, but his written report and the addendum to that report were not introduced into evidence.  Wright attached the report and addendum to his 3.850 motion filed in 1988.

Dr. Latimer's report stated that Ms. Smith could have died between 5:00 and 8:00 PM on Saturday.  Dr. Latimer's addendum stated that: (1) he based his report on Ms. Smith having a normal diet and retiring time; and (2) "[s]hould either of these not be appropriate to this subject, the time of death could be extended from 1700 [5:00 PM] on Saturday the 5th until sometime in the morning hours of Sunday the 6th."

## B.    Fingerprint Expert David Latent

David Latent of the Florida Department of Law Enforcement testified as an expert regarding latent fingerprints.  Officer Latent found a latent fingerprint on a "portable stove" in Ms. Smith's bedroom.[4]  Officer Latent identified that fingerprint as being left by defendant Wright.

## C.    Serologist James Pollock

James Pollock, a forensic serologist, examined blood samples taken from Ms. Smith's home after the murder.  Pollock "was not able to find any blood that was not consistent with that of the victim, Lima Paige [Smith]."

## D.    Charles Westberry

Another key witness was Charles Westberry, a friend of Wright's for "[s]even or eight years."  Wright confessed to Westberry about killing Ms. Smith.

Specifically, on the evening of Saturday, February 5, Westberry went to a bar with his girlfriend, and the couple returned to a trailer owned by his brother. Westberry lived in the trailer with his brother and his brother's wife and son.

Westberry remained in the trailer until Sunday morning when, just after dawn, Wright came "and knocked on the front door."  Westberry did not answer. Wright went "to the bedroom window and knocked on the side of the trailer."

---

[4]Pictures of this "portable stove" were introduced at trial, and the pictures showed that it was a two-burner hot plate.  Additionally, a detective testified that the stove was a "two-burner kerosene stove."

5

Westberry answered and ushered Wright in through the front door and into the living room. According to Westberry, Wright told him "he'd killed Miss Smith."

To prevent others from hearing their conversation, Westberry invited Wright out of the trailer and into Westberry's truck, which was parked outside. There, Wright told Westberry "what had happened." Wright told Westberry that: (1) he went to Terry Geck's to a party and Geck brought him home and dropped him in front of his mother's house; (2) Wright walked in front of Ms. Smith's house and thought he saw her asleep in her car; and (3) thinking Ms. Smith's home was unoccupied, Wright went around to the back, entered by climbing through a window, and found Ms. Smith's pocketbook.

Wright also told Westberry that he stole all of the money from Ms. Smith's pocketbook and started to wipe his fingerprints off of it. While doing so, "[h]e looked up and saw Miss Smith standing there." According to Westberry, after Ms. Smith's unexpected entrance, Wright "found a knife and cut her throat." Wright explained that he killed Ms. Smith because "she recognized him, and . . . he didn't want to go back to prison."

Westberry testified that Wright then: (1) "found a rag and wiped off everything he thought he may have touched"; (2) "went outside and wiped down the window that he went through"; (3) "raked around the window with his hand

6

where he might have left a footprint"; and (4) "went out behind the house, somewhere[] in the woods, and hid a jar of money he got."

The prosecutor asked Westberry if Wright described the "jar of money to [him] in any way." Westberry answered, "No, sir." The prosecutor asked if Wright told him "what the jar contained, what type of money?" Westberry answered, "Change."[5]

Wright did not mention to Westberry anything about raping Ms. Smith. Westberry added: "He swore—after it [came] out in the papers he swore to me he didn't" rape her.

According to Westberry, during his conversation with Wright in the truck, Wright "pulled out the money that he got out of Miss Smith's pocketbook" and counted it. The money totaled more than $290.

Later that morning, Westberry drove Wright to a 7-Eleven store for coffee. There, Westberry noticed blood stains below Wright's ear and told Wright about it. Afterwards, Westberry drove Wright by Ms. Smith's house on their way to get cigarettes. At that point, Wright commented that it did not "look like they found her yet." After buying cigarettes, Wright and Westberry drove back to Westberry's brother's trailer and rested. Later that morning, Wright and Westberry

---

[5]Although post-conviction counsel later referred to Westberry testifying about a "glass jar," Westberry's trial testimony did not say "glass jar." Rather, Westberry said that Wright described taking a "jar of money" and that Wright did not further describe this "jar of money" to him.

went to a store to buy "some beer and some more cigarettes and some bait" and then went fishing. Wright used money stolen from Ms. Smith to pay for the beer, cigarettes, and bait. Wright also used Ms. Smith's money to buy gas.

After their fishing trip, Westberry drove Wright back to Wright's parents' house. Wright and Westberry noticed law enforcement officers at Ms. Smith's home. Before Wright left Westberry's truck, Wright asked Westberry "to tell [law enforcement officers] that he had spent the night with [Westberry] Saturday night."

On Tuesday, February 8, Sheriff's Detective Taylor Douglas interviewed Westberry. Per Wright's instructions, Westberry told Detective Douglas that Wright arrived at his trailer at about 1:30 or 2:00 AM on February 6 and stayed there for the remainder of the evening.

Around April 15, 1983, Westberry told his estranged wife, Paige, what Wright had told him. Westberry told Paige that he was having nightmares during which he saw Ms. Smith lying in a pool of blood. Paige Westberry testified at trial that she relayed what Westberry told her to Deputy Sheriff John Blahak.[6]

On April 18, 1983, Westberry was arrested and charged with a third-degree felony offense, being an accessory after the fact to the first-degree murder of Ms. Smith, see Fla. Stat. § 770.03. On August 3, Westberry pled guilty to the reduced misdemeanor offense of compounding a felony, see Fla. Stat. § 843.14.

---

[6]During a 1988 evidentiary hearing, Westberry stated that, by April 1983, Paige was dating a deputy sheriff and thus told him what Westberry, her estranged husband, had told her.

As part of his written plea agreement, Westberry promised "to testify <u>truthfully</u> in the case of State v. Joel Dale Wright."

During cross-examination, Wright's defense counsel had Westberry admit that he was initially charged with a third-degree felony in connection with Ms. Smith's murder punishable by five years in prison and that his plea agreement allowed him to plead to a first-degree misdemeanor carrying a maximum one-year penalty in the county jail.

Defense counsel showed Westberry his separate Contract of Immunity, which Westberry admitted signing. Westberry acknowledged this document gave him immunity from prosecution for having entered the residence of Lima Paige Smith.

### E.    Paul House

Another acquaintance of Wright's, Paul House, testified that he accompanied Wright into Ms. Smith's home. This occurred approximately one month before Ms. Smith's murder. The pair entered without permission through a rear window. House testified that they did so to look around and "[t]o get change out of the garbage and stuff."

### F.    Detective Walter Perkins

On April 18, 1983, Sheriff's Detective Walter Perkins interviewed Wright at the Putnam County Jail. At the onset of the interview, Detective Perkins advised

Wright of his constitutional rights, which Wright confirmed he understood.

Afterwards, according to Detective Perkins, Wright said: "'If I confess to this, I

will die in the electric chair.  If I don't talk I stand a chance of living.'"

### G.    Testimony of William Bartley

William Bartley, a Palatka resident, did yard work for Ms. Smith.  Bartley

testified that, on January 28, 1983, he was working in Ms. Smith's yard when

Wright walked by.[7]  Bartley testified that Wright said "that it was about time for

the old lady to die and stuff."  Wright also said "there probably be [sic] some

money in the house somewhere between all those papers and stuff in the house."

## II.  WRIGHT'S GUILT PHASE EVIDENCE, 1983

Wright's defense counsel at trial was Assistant Public Defender Howard

Pearl, who specialized in capital litigation.  The trial court told Wright that "there

is no better capital crimes lawyer available than Mr. Pearl."  Pearl obtained

considerable pre-trial discovery, including depositions from several of the State's

witnesses and documents and other evidence from the State.

The state trial court permitted Pearl to give his opening statement after the

prosecution finished its presentation of evidence.  Pearl called nine witnesses,

---

[7]The trial transcript shows this witness's surname as "Barkley."  However, the 3.850 evidence established that his surname is actually "Bartley."

10

including Wright and Charlotte Martinez, who gave testimony relevant to the issues before us.[8]

## A.    Defendant Wright

In his testimony, Wright admitted being with Charles Westberry during the night of the murder. Although Westberry said Wright came to his trailer around dawn on Sunday, February 6, Wright testified he got to Westberry's much earlier—around 1:00 AM that day.

Wright testified that, on the afternoon of Saturday, February 5, he was first with Kenny Westberry (Charles Westberry's brother) and Doc Ryster "picking up scaffold and loading it on Kenny's truck." Around 5:00 or 6:00 PM, Wright went to his house. Around 8:00 PM, he went to Geck's home to play poker.

According to Wright, he stayed at his friend Geck's house "playing poker and drinking" until "after midnight." He won $28 in the game. Around 12:30 AM, Geck drove Wright home.

---

[8]Additionally: (1) Captain Clifford Miller testified there was a streetlight across the street from Ms. Smith's home; (2) Lieutenant Derry Dedmon, a polygraph operator, testified that, on February 10, 1983, he interviewed Wright and he never interviewed Westberry; (3) Paige Westberry testified that she and Westberry had a conversation about Ms. Smith's death, and Westberry said that he was having difficulty with Wright who was "trying to cause trouble between Charles [Westberry] and his friends"; (4) Wright's two sisters testified that Wright is left-handed; (5) a neighbor of Ms. Smith's testified that, sometime between 10:00 PM and 12:00 AM on February 5, he saw three male strangers walking down Ms. Smith's street and saw them again after midnight; and (7) Ruby Ammons testified that Wright worked for her and her husband and had access to a trailer in which the Ammons stored merchandise.

11

When Wright got out of Geck's truck, he approached the door of his house and discovered that he was locked out.  Wright then "walked to Charles Westberry's house."  Contrary to Westberry's testimony that Wright arrived around dawn, Wright estimated that he arrived at Westberry's trailer, "somewhere between quarter to one and one o'clock."

When Wright arrived at Westberry's trailer, he "knocked on the door, but nobody answered."  Then he "walked around to [Westberry's] window" and "knocked on the side of the trailer, and Charles told [him] to meet him at the door."  Wright told Westberry he was locked out of his house and asked him if he could stay the night in the Westberrys' trailer.  Westberry "said sure."  Wright testified: "He gave me a blanket and I slept on the couch."

Wright denied breaking into Ms. Smith's home, taking money from her, or killing her.  He said that Westberry had lied during his testimony.  Wright denied making the statement to Detective Perkins regarding a fear of dying "in the electric chair."

## B.    Charlotte Martinez

Charlotte Martinez, another Palatka resident, testified about an interaction with Wright shortly after Ms. Smith's murder, when Wright had only $7 in "mostly pennies."

12

In his opening statement, Pearl explained he would call Martinez "to demonstrate . . . that the [$290.00] kitty that Charles Westberry testified to could not have been in existence, or if it was that . . . Wright didn't know about it or otherwise he wouldn't have used that money to buy beer."

Martinez testified that, in mid-February of 1983, she and her friends drove to Wright's home and picked Wright up.  She intended to take Wright back to her house, where the group would "drink some beer."  However, no one in the car had any money to purchase beer.

The group agreed that Wright would pay for the beer.  Martinez testified that Wright "was waiting for his check, and he said he had to break into his [piggy] bank to get the money because his check didn't come that day."  Wright went into his house and retrieved a "glass vase" filled with "[m]ostly pennies."  The group counted the money in the container and found that it contained "about seven dollars."  With this money, the group purchased two six-packs of beer and returned to Martinez's house and drank the beer.[9]

### III.  VERDICT, 1983

---

[9]During the trial, prosecutor Dunning received a tip from Martinez about a "glass vase." Martinez did not want to testify against Wright, but was willing to meet Dunning and give him the vase that Wright had possessed.  Dunning advised the trial judge and Pearl.  Dunning then met Martinez, tape-recorded his meeting, received the vase, and immediately told Pearl.

Dunning did not call Martinez as a witness, but Pearl decided to call her to show Wright had only $7, mostly in pennies, and not the $290 that Westberry claimed was taken from Ms. Smith.

After nine days of trial, on September 1, 1983, the jury found Wright guilty of: (1) one count of first-degree murder, see Fla. Stat. § 782.04; (2) one count of sexual battery with force likely to cause serious personal injury, see id. § 794.011(3); (3) one count of burglary of a dwelling, see id. § 810.02(3); and (4) one count of grand theft of the second degree, see id. § 812.014.

## IV.  PENALTY PHASE, 1983

The next day, the trial court held a penalty-phase hearing before the jury. The State introduced evidence of Wright's criminal history, which showed Wright: (1) had two 1975 juvenile convictions for possession of a stolen motor vehicle and petit larceny; and (2) in 1981, pled guilty to breaking into a church with intent to steal, for which he received probation.  Based on these convictions, the State argued that the statutory mitigating circumstance of "no significant history of prior criminal activity" did not apply.  See Fla. Stat. § 921.141(6)(a).

The State contended that the jury should find four aggravating circumstances.  First, the murder was committed during a burglary.  See Fla. Stat. § 921.141(5)(d).  Second, the murder was "for financial gain, that [Wright] was in the process of stealing money from Lima Paige Smith, and it was at that point in time that . . . he looked up, he saw her in the doorway or in the hallway, knew that she would recognize him," and killed her.  See id. § 921.141(5)(f).  Third, the murder was "committed in a cold, calculated, and premeditated manner," see id.

14

§ 921.141(5)(i), and, fourth, the murder was "especially heinous, atrocious, or cruel," see id. § 921.141(5)(h). The State pointed out that Wright used a knife to carry out a violent sexual battery prior to killing Ms. Smith.

Defense counsel Pearl asked the jury to refrain from sentencing Wright to death. Pearl argued, inter alia, that there was no evidence of heightened premeditation that was required for the cold, calculated, and premeditated aggravating circumstance. Pearl contended that, to satisfy this aggravating circumstance, the State needed to show "special cold, calculated and premeditated manner or design, a plan of longstanding." Pearl argued, "I feel that that evidence has not been provided to you and has not been proved beyond a reasonable doubt."

Turning to mitigating circumstances, Pearl pointed out that Wright's prior offenses had not involved violence towards a person and, thus, Wright did not have a significant criminal history. Pearl asked the jury to find the mitigating circumstance of "influence of extreme mental or emotional disturbance." See Fla. Stat. § 921.141(6)(b). Pearl directed the jury's attention to a psychological report, prepared in 1974, in which a clinical psychologist found that Wright: (1) was "probably emotionally unstable"; (2) felt "depressed and inadequate"; (3) was "immature and self-centered"; (4) had "difficulty with interpersonal relationships"; and (5) had a "hostile-dependent relationship with his mother." Pearl emphasized

that Wright had not received any treatment in the nine years after the psychologist recommended treatment.

The jury returned an advisory 9-3 verdict in favor of the death penalty.

A few weeks later, the state trial court sentenced Wright to death for the first-degree murder.[10]  The trial court did not find any statutory mitigating circumstances.  The trial court found these four statutory aggravating circumstances: (1) the murder was committed while Wright was engaged in the commission of the rape of Ms. Smith and burglary, see Fla. Stat. § 921.141(5)(d); (2) the murder was committed "for the avowed purpose of preventing [Wright's] arrest on burglary charges," see id. § 921.141(5)(e); (3) the murder was "especially heinous, atrocious and cruel," see id. § 921.141(5)(h); and (4) the murder was committed "in a cold, calculated, and premeditated manner without any pretense of moral or legal justifications," see id. § 921.141(5)(i).  The trial court also found that the murder was committed for pecuniary gain, see id. § 921.141(5)(f), but this circumstance merged with the "while in commission of another violent felony" aggravating circumstance.

## V.  DIRECT APPEAL, 1985

---

[10]The trial court also sentenced Wright to: (1) 99 years' imprisonment on the sexual battery count; (2) 15 years' imprisonment on the burglary count; and (3) 5 years' imprisonment on the grand theft count, with all sentences running consecutively.

16

On direct appeal, the Florida Supreme Court affirmed Wright's convictions and sentences.  See Wright v. State ("Wright I"), 473 So. 2d 1277 (Fla. 1985).

Wright challenged, inter alia, his death sentence, arguing that the trial court erred in applying two of the statutory aggravating circumstances.  Id. at 1281.  The state supreme court agreed with Wright "that the trial court erred in finding the murder to be cold, calculated, and premeditated" because "heightened premeditation was not proved beyond a reasonable doubt."  Id. at 1282.  The Florida Supreme Court also determined that "[b]ecause the court properly found there were no mitigating and three aggravating circumstances, . . . the imposition of the death penalty was correct and . . . it [was] unnecessary to remand for a new sentencing hearing."  Id.

## VI.  FIRST STATE 3.850 MOTION, 1988

In 1988, Wright filed an amended motion to vacate his convictions and his death sentence pursuant to Florida Rule of Criminal Procedure 3.850.[11]  Wright's amended motion included the guilt-phase claims at issue here: (1) alleged Brady violations; and (2) an ineffective-trial-counsel claim that Pearl failed to call Wright's family member, who was ready to testify that the "glass vase," discussed

---

[11]Rule 3.850 provides the possible grounds for a Florida prisoner to have his conviction or sentence set aside as well as the procedures for filing such a motion.  See Fla. R. Crim. P. 3.850.  Rule 3.851, not enacted until 1993, applies only to prisoners who have "been sentenced to death and whose conviction[s] and death sentence[s] have been affirmed on direct appeal," and provides different procedures for death sentence prisoners seeking to have their convictions or sentences set aside.  See Fla. R. Crim. P. 3.851(a).

17

by Martinez, was a family heirloom.[12]  After conducting a two-day evidentiary hearing, the 3.850 court denied all of Wright's claims.

The Florida Supreme Court subsequently affirmed.  See Wright v. State ("Wright II"), 581 So. 2d 882 (Fla. 1991).  The Florida Supreme Court quoted extensively from the 3.850 court's order analyzing Wright's Brady and ineffective-counsel claims.  Id. at 883–86.  After doing so, the Florida Supreme Court summarily stated: "We find that the trial court properly denied relief on each of the claims made in Wright's initial rule 3.850 motion."  Id. at 886.

We review the 3.850 evidence and rulings on Wright's Brady and ineffective-counsel claims.

## VII.  3.850 BRADY CLAIMS

Wright made three different Brady claims.

## A.    Alleged Immunity Agreement About Scrap Metal Thefts

At trial and during the 3.850 proceedings, it was acknowledged that the State entered into a July 19, 1983 written "Contract of Immunity" with Charles Westberry.  This Contract was disclosed to the defense and related to Westberry entering Ms. Smith's residence.  Wright's first Brady claim was that the prosecution also allegedly entered into a separate verbal immunity agreement with Westberry about scrap metal thefts, but did not disclose it.

---

[12]In this appeal, Wright also has one death sentence claim, but that claim was not raised until 2002, as discussed later.

18

At the 3.850 hearing, Westberry testified that he entered into the July 1983 Contract of Immunity and that there was no immunity agreement for the scrap metal thefts.[13]  James Dunning, the prosecutor at Wright's trial, testified at the 3.850 hearing that "the grant of immunity was limited to matters referring to the breaking and entering of the residence of [Ms.] Smith, and no other crimes or criminal acts."

Prosecutor Dunning also explained that, after the State granted Westberry immunity, Westberry told him about participating in scrap metal thefts.  Prior to trial, Westberry told Dunning that "on several occasions Joel Wright stole scrap metal . . . .  And after he had done so several times, he then asked [Westberry] if [he] wanted to make some more money, and go with him and help him."  Westberry did not provide Dunning any further details about these scrap metal thefts, including when they occurred.

Checking the Sheriff's records, Dunning found an "incident report at one time filed with the Sheriff's Office wherein . . . people alleged that on a particular date some scrap metal was stolen."  But, Dunning was unable to link Westberry to the thefts and had no stolen property to introduce as evidence in a possible scrap-

---

[13]The record includes the August 3 plea agreement, but does not include the July 19 Contract of Immunity.  However, there is no claim or argument from either party that the July 19 Contract of Immunity referenced scrap metal thefts.

19

metal-theft prosecution of Westberry.  Accordingly, Dunning determined that there was not "any hope of ever prosecuting" Westberry for the scrap metal thefts.

Before trial, Dunning told Westberry that "it was extremely doubtful" that he would be prosecuted for the scrap metal thefts.  But, Dunning warned Westberry that "if the Sheriff's Office did develop information that would give [it] probable cause where [it] could file he may well be charged with it."

Dunning was certain that defense counsel Pearl "was made aware of . . . the scrap metal matter."

The 3.850 court found that no immunity contract existed for the scrap metal thefts.  The 3.850 court noted that defense counsel Pearl "fully cross-examined Westberry about the [July 19, 1983 Contract of Immunity] at trial."  The 3.850 court found "the jury was aware of this deal and able to believe or disbelieve the witness."

The Florida Supreme Court affirmed the 3.850 court's denial of Wright's alleged-immunity-agreement Brady claim.  See Wright II, 581 So. 2d at 886.  The state supreme court noted that: (1) Westberry testified "that the state attorney never promised him he would not be prosecuted on the scrap metal thefts"; and (2) the prosecutor testified "that he found out about the scrap metal thefts after he had given Westberry immunity on the murder."  Id.  The court found "the record reflects that defense counsel was aware of the scrap metal thefts and, in fact,

20

proffered testimony at trial regarding the activity." Id.  After discussing this alleged-immunity-agreement claim, the Florida Supreme Court concluded:  "On the basis of this record, we find that the trial judge properly denied relief on this claim." Id.

**B.    Notes Given to Westberry**

Wright's second Brady claim alleged that prosecutor Dunning gave notes to the State's key witness, Charles Westberry, but did not produce those notes to the defense.  At the 3.850 hearing, Dunning explained why he did not consider the notes evidence and thus did not give them to Pearl.

In the week before Wright's trial, Dunning met with Westberry "about once a day."  Dunning was "going over and over with [Westberry] what Joel Dale Wright told him" and "looking . . . to see if there [were] any inconsistencies in what [Westberry] was saying, anything to suggest . . . that he was fabricating, or making up, or adding on things that were not part of his conversation or activities with Joel Dale Wright."  Dunning found that Westberry's statements "remained consistent."

During his meetings with Westberry, Dunning made notes listing facts that Dunning thought he could prove through various witnesses.  On one occasion prior to trial, Dunning gave his notes to Westberry and "asked him to review it, go over it, make sure what was on there was what he told [Dunning], make sure what was

on there was the truth." The notes could have been "answers without [the] questions" that he intended to ask at trial.

When he gave the notes to Westberry, Dunning instructed Westberry to "forget about what [Dunning] put down on that piece of paper, [and] to testify in court under oath as to exactly what he remembered." Dunning did not give the notes to Westberry to assist Westberry's recollection, but rather to assure that he, Dunning, "understood what [Westberry] was saying and what he was going to be testifying to."

Dunning further explained: "the notes weren't evidence. Those were my summary. You know, I'm not going to give an opposing attorney a list of all the questions I'm going to ask of a witness at trial."

In the 3.850 hearing, Westberry also testified that Dunning's notes contained Westberry's own words. Westberry affirmed that he did not use those notes while testifying at trial.

The 3.850 court denied this Brady claim, explaining: "[t]he so-called script furnished to Westberry would not tend to exonerate the Defendant." The court found, "Both the former prosecutor and Westberry testified at the [3.850] evidentiary hearing that the document contained a summary of Westberry's prior statements, in Westberry's own words. . . . As such, the so-called script is not Brady material and the Defendant's claim does not warrant relief." The Florida

Supreme Court affirmed, quoting parts of the 3.850 court's order and stating that the 3.850 court "properly denied relief" on this claim. Wright II, 581 So. 2d at 883–86.[14]

## C.    Witness Statements

Wright's third Brady claim involved written statements from Kimberly Holt, Wanda Brown, and Charlene Luce. The prosecution did not give Pearl copies of these statements. Wright contends that these statements were exculpatory Brady material because they tended to implicate two other suspects: Henry Jackson and William Strickland.

The Florida Supreme Court affirmed the 3.850 court's denial of this Brady claim, agreeing with the 3.850 court that: (1) it was "highly speculative" that the statements were "exculpatory in nature"; (2) the defense was aware of the information in the statements; and (3) Wright's Brady claim was legally insufficient. Wright II, 581 So. 2d at 883. We examine each statement, starting with Holt's, as well as the 3.850 court's findings about each statement.

### 1.    Holt's Statement

---

[14]The Florida Supreme Court affirmed the entirety of the 3.850 court's order. For some issues, such as the alleged immunity for the scrap metal thefts discussed above, the Florida Supreme Court decision contained more analysis. Wright II, 581 So. 2d at 886. For other issues, the Florida Supreme Court quoted extensively from the 3.850 court's analysis and summarily stated that the court "properly denied relief on each of the claims." Id. at 883–86.

23

Kimberly Holt's written statement, dated February 28, 1983, said she worked as a cashier at Miller's Supermarket.[15]  On Sunday, February 6, she worked a shift from 3:00 to 10:00 PM.  At 4:30 PM, a man "with fresh scratch marks on his face" came through her check-out line.  His "scratch marks were still breeding [sic] and his shirt was torn."  Although the man usually paid with "food stamps or bottles," on this occasion, he paid for two cases of beer with a one hundred dollar bill.  Holt saw another $100 bill in his wallet.  He said, "I got money today."

Then, the man asked Holt "if [she] knew that Mrs. Smith was dead?"  Holt said, "Pardon me?"  The man again asked if she knew "Ms. Smith was dead[?]"  Holt said, "That is terrible, I can't believe that anyone would kill a beautiful woman like that."  Holt recounted that an officer asked her if the person in the store was the same person in the mug shot book named "Henry Jackson."  Holt wrote: "Yes it is."[16]

---

[15]"Holt" was the witness's surname in 1984; however, by the time of the 3.850 hearing in 1988, her surname had changed to "Holliman."  For ease of reference, we refer to her as "Holt" throughout.

[16]Five years later, in 1988, Holt signed an affidavit repeating this information from her 1983 statement.  Jackson died in 1985.

Holt's 1988 affidavit added this new information: (1) she had seen Jackson with a "small silver pocket knife" several times; and (2) Jackson "had blood on his hands and his face was scratched and his shirt collar was torn."

24

Although the defense did not receive the Holt statement, Pearl and his investigator, Freddie Williams, did interview Holt before trial (in June or July of 1983) "in connection with an allegation that a certain person had acted suspiciously" at the supermarket shortly after Ms. Smith's murder "and seemed to have been related to Miss Smith's death." Pearl acknowledged that Holt had "said the same things to us that she related in the statement" and that Pearl and Williams had "discovered it independently." Pearl could not "say that it would have been terribly important to our investigation under those circumstances for [the Holt statement] to have been disclosed to us." Williams testified similarly, stating: "We received some information through our investigation that there was a lady that worked at Millers grocery store there on the corner of, I think it's Palm and Highway 20, that had some information pertaining to a suspect."

After interviewing Holt, both Pearl and Williams "were satisfied that she didn't have any information that would help [them]." This is not surprising, given that the medical examiner opined that the murder probably occurred Saturday night or early Sunday morning, and it was not until 4:30 PM on Sunday that Holt saw the man with fresh scratch marks still bleeding. Further, the serologist testified that the blood samples obtained from the murder scene were all consistent with coming from Ms. Smith, meaning that if this bleeding man raped and killed Ms. Smith, he somehow avoided leaving any blood in her home.

25

Based on this testimony, the 3.850 court determined that the State's failure to disclose the Holt statement was not a <u>Brady</u> violation, stating, "defense counsel testified that he knew of the incident involving Ms. Holt and, in fact, had interviewed her with Mr. Williams . . . ."

2.    Brown's Statement

Wanda Brown's statement, dated February 7, 1983, said she was "a substitute mail carrier" in Ms. Smith's neighborhood. On Saturday, February 5, Brown was delivering mail and observed Ms. Smith inside of her fenceline motioning with her hand to a white male to move on down the street. The man "shook his arm at Ms. Smith and walked towards the middle of the road in front of [Brown's] vehicle." Brown stopped her Jeep, walked to the side of it, and realized that the man was intoxicated. The man wore plaid slacks and a plaid sports coat that clashed in color and design. His speech was slurred, and he had difficulty standing.

The intoxicated man asked Brown "why there was usually a man mail carrier but today it was a woman." Brown asked him "what he wanted," and the man asked "if [Brown] had his check." Brown inquired "who he was," and he replied, "Strickland, I live with Henry Jackson.'" Brown told Strickland that she had no mail for his address. Strickland replied, "I need my check[.] I need some

money.  Have you got some money I can have?'"  Brown became scared and drove away.

Unlike Holt, Pearl never spoke to Brown.  Had he received the Brown statement, Pearl "would have been mildly interested, and would have wanted to develop it further."  Pearl acknowledged, however, that the Brown statement "[i]n and of itself . . . does not indicate that [Jackson] would have been a likely suspect." And, as noted, the 3.850 court found that it was "highly speculative" that the statements here were "exculpatory in nature."

### 3.    Luce's Statement

Charlene Luce's statement, dated February 9, 1983, said she was a neighbor of Jackson and Strickland.  Around 3:30 or 4:00 PM on Friday, February 4, Luce was in her yard and saw Strickland, dressed in clothes that did not match, arguing over clothes and money with Jackson.  Strickland called Luce to the fence and asked her to put some meat in her freezer.  When Luce refused, Strickland told her that he did not like anyone messing with his clothes, he was from Texas, and he had been in Palatka for about two weeks.  Strickland said that he "wasn't scared of Leroy or Henry[;] they may kill [him] but [he was] not scared of anyone."  Luce walked away.

Jackson then came outside, threw a blue trunk on the ground, and went back into the trailer where he and Strickland lived.  Jackson "came back to [his] door

with a [pocket]knife in [his] right hand.  He was very upset." Luce "yelled at him to calm down and take a deep breath." Strickland quickly walked to the back of the trailer.  Jackson "walked closer to the fence talking about [how] he was a white man and always will be." Jackson told Luce "that Strickland had his money and he wanted it." Luce walked away and went inside.

Two days later, "about 4:30 or 5:00 afternoon [sic]" on Sunday, Luce went outside, and Jackson called her over to the fence.  He told her "that Miss Smith was kill[ed]." Luce "asked Jackson if he did it." Jackson's face "turn[ed] red," and he "turned away." Luce's statement said: "I'm just joking.  Strickland was talking [sic] didn't understand what was said." Jackson told Luce that Ms. Smith "gave him the best Christmas gift," which was "a box of candy." Ms. Smith also "gave him a carton of cig[arettes]." Jackson talked "about cutting some trees down for Ms. Smith."[17]  When Luce asked why anyone would kill Ms. Smith, "Jackson said that Miss Smith told him she didn't keep money at home."

Defense investigator Williams said: "I do recall talking to someone about this case and the only thing I remember about this person was the Christmas gift, a box of candy.  And I can't say that's absolutely sure, but I do remember that part of

---

[17]Ms. Smith lived on Third Avenue in Palatka, in the third house on the right off of State Road 19.  Jackson and Strickland lived in a trailer three blocks from Ms. Smith's house.  Miller's Supermarket was located at the intersection of Palm Avenue and Highway 20.  Luce has Jackson in his yard near Luce's fence at about "4:30 or 5:00 afternoon [sic]." And Holt has the fresh-scratch-marks man, whom she later identified as Jackson from a photo lineup, in Miller's Supermarket at 4:30 PM on Sunday.  Interestingly, Miller's Supermarket was about one mile from Third Avenue, where Ms. Smith, Jackson, Strickland, and Luce all resided.

it." Williams remembered having heard that statement before and that "[i]t was probably prior to trial, because we did a neighborhood interview out there, and this lady lives in the neighborhood." Because Luce lived in the neighborhood where Williams and Pearl conducted interviews, Williams stated: "We probably talked to her. Had to talk to her." When asked if he "may have talked to [Luce] and got the information straight from her," Williams responded: "That's true. I don't recall ever seeing this statement, but I do remember the box of candy in here. I do remember talking to somebody about that."

Williams also acknowledged that Pearl "knew about Henry Jackson" and "knew about Clayton Strickland" as possible suspects. Williams confirmed that he talked to the Sheriff's investigators about Jackson and Strickland and that the Sheriff's investigators ran Jackson and Strickland past him.[18] Williams "worked closely" with Pearl and discussed information with him.

Given Williams's testimony, the 3.850 court determined that it was "likely that defense counsel was made aware of the statement[] through Mr. Williams." Given its conclusions, the 3.850 court denied Wright's Brady claim based on the Luce statement.

---

[18]During their investigation, the Sheriff's office investigators interviewed both men. Strickland told investigators he met Ms. Smith "a couple of months ago," last spoke to her the "Tuesday or Wednesday" before the murder, did not kill Ms. Smith, and did not know who did.

Jackson told investigators he knew Ms. Smith for about 20 years, did not have any idea who killed Ms. Smith, and answered "hell no" when asked if he killed her.

And, as noted above, the 3.850 court, in effect, determined that all three statements were not exculpatory anyway.  And, the Florida Supreme Court quoted and affirmed that ruling, too.  Wright II, 581 So. 2d at 883, 886.[19]

## VIII.  3.850 INEFFECTIVE-COUNSEL CLAIM

As discussed above, at trial, defense counsel Pearl called Martinez to testify about Wright using $7 "mostly in pennies" from a "glass vase" to buy beer.  Wright's 3.850 motion claimed that, in the guilt phase, defense counsel Pearl was ineffective for not also calling Wright's family member to testify that this "glass vase" was a family heirloom.

At the 3.850 hearing, Pearl testified that he suspected the State would argue that the "glass vase" was the "jar of money" that Westberry said Wright took from Ms. Smith's home.  Therefore, Pearl located one of Wright's family members who would identify the "glass vase" as a family heirloom.  The family member traveled to Florida to testify at the trial.  Pearl was "prepared then to go forward if the State would have produced the jar to say that in fact it had always been in the family,

---

[19]Wright further alleges that the Holt, Brown, and Luce statements would have led him to interview William Bartley.  Bartley testified at the 3.850 hearing to observing Jackson and Strickland drinking in an empty lot next to Ms. Smith's home on the night of the murder.  But, Bartley did not tell anyone about this observation until after trial, even though he gave a statement to police and testified at trial.  Thus, Bartley's testimony did not constitute Brady material.  Because the Holt, Brown, and Luce statements were not Brady material, we need not consider whether those statements would have led defense counsel to Bartley.

and could not have been the glass jar that had been taken by whoever killed Miss Smith."[20]

Pearl testified that he forgot to call the family member, explaining at the 3.850 hearing: "It was a lapse, a mistake.  I just—I can't explain it to you.  It is as if it passed out of my mind, perhaps due to the pressure of other matters during the trial.  But I cannot explain it.  It was inferior performance."

Throughout his 3.850 testimony, Pearl referred to Martinez's testimony as being about the "glass jar" and Westberry's testimony as being about a "glass jar," trying to equate the two testimonies.  Pearl's 3.850 testimony, however, was inaccurate as the 1983 trial transcript shows neither Martinez nor Westberry testified about a "glass jar" at trial.  Rather, at trial, Martinez described the item as a "glass vase."  In contrast, Westberry discussed a "jar of money" and never described the material of the jar.[21]

The 3.850 court denied this claim and Wright's other ineffective-counsel claims (none of which are at issue here), stating that they were "completely without merit."  The 3.850 court cited and applied Strickland,[22] noting Wright must prove deficient performance below that of competent counsel and that counsel's

---

[20]Although Dunning received the "glass vase" from Martinez, the State never introduced the vase into evidence nor called Martinez as a witness.

[21]These mistakes in Pearl's 3.850 testimony are not surprising, as the trial occurred five years before the 3.850 hearing, and defense counsel Pearl was testifying in support of Wright's 3.850 claim and offering testimony to establish his own ineffectiveness.

[22]Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984).

performance was prejudicial to the defense.  The 3.850 court explained that Wright's "offer of proof with regard to his allegations of ineffective assistance of trial counsel are insufficient to demonstrate deficient conduct below . . . professionally recognized and accepted standards of professional conduct."  The 3.850 court also pointed out that "the majority of the alleged errors are strategic in nature and this Court will not second guess trial strategy employed by trial counsel."

## IX.  PROCEEDINGS ON ADDITIONAL 3.850 CLAIMS, 1991–2003

### A.    Wright's Additional 3.850 Claims, 1991–1997

Wright later filed several motions to amend his 3.850 motion once again.  In his 1991 amendment, Wright's motion stated that his post-conviction attorney recently received from the Sheriff's Office previously undisclosed incident reports regarding other alleged criminal activities of Jackson before Ms. Smith's murder.[23]

The public incident reports showed that Palatka residents had called the police about Jackson in the past: (1) in August 1980 for trespassing; (2) in October 1980 for public intoxication and a loud disturbance; (3) in January 1981 for a disturbance; (4) in July 1981 for fighting in public; (5) in April 1982 for disturbances; (6) in June 1982 after Jackson refused to leave a residence where he

---

[23]Although this 1991 filing was arguably a successive 3.850 motion, the state court treated it as an amendment to Wright's previous 3.850 motion filed in 1988.

32

was living; (7) in October 1982 for drug use; and (8) in February 1983 after Jackson drunkenly discharged a firearm.[24]

## B.    Evidentiary Hearing, 1997

In 1997, the 3.850 court held an evidentiary hearing on Wright's new claims, which included his new Brady claim.  The court limited Wright to presenting evidence relevant to his new claims and ordered him not to attempt to relitigate issues resolved during the earlier 3.850 proceeding in 1988.

The 3.850 court heard testimony from residents of Putnam County regarding Jackson.  For example, Leon Wells testified that, in the early 1980s, he worked at a convenience store in Palatka and frequently observed Jackson and his brother fighting.  Wells called the police on Jackson once in 1981 and recalled that Jackson liked knives.

Glenna Fox testified that, in 1980, she called the police after she awoke in the middle of the night and found Jackson shaking her screen door and trying to get her to open the door.  When Fox came to the door, Jackson asked her, "do you have a light[?]"[25]

## C.    3.850 Court's Denial of Additional Claims, 2000

---

[24]The 1984 incident reports, from after Ms. Smith's death, did not exist at the time of the August 1983 trial, and we need not list them.

[25]In 1997, Ella Hill testified that Jackson killed his brother-in-law and once fired a shot into the front door, but gave no time frame or any other details.

33

In 2000, after the evidentiary hearing, the 3.850 court denied Wright's claims, stating: "As to the additional claims made by the Defendant, most are simply untimely or could have been discovered prior to trial or prior to the filing of the initial post-conviction motion and are thus barred."  In addition, the 3.850 court stated: "Claim III concerns claims [of] newly discovered evidence, i.e. police reports of incidents involving Henry Jackson and Clayton Strickland.  Both of these gentlemen were initially interviewed by the Putnam County Sheriff's Office and were eliminated as suspects early on."[26]  Thus, the 3.850 court concluded: "The defense team knew of these gentlemen well before trial.  The fact that police reports existed on these persons . . . could have been discovered by the trial team. There is simply no newly discovered evidence."

Wright appealed the denial of 3.850 relief.

## D.    Florida Supreme Court 3.850 Decision, 2002

In 2003, the Florida Supreme Court affirmed the denial of Wright's additional 3.850 claims.  See Wright v. State ("Wright III"), 857 So. 2d 861 (Fla. 2003).

In that appeal, Wright argued that, in his first 3.850 proceeding, the 3.850 court in 1988 and the Florida Supreme Court in 1991 erred in denying Wright's claim that the State violated Brady when it failed to disclose the Holt, Brown, and

---

[26]The 3.850 court referred to incident reports involving Strickland, but the reports attached to Wright's 3.850 amendment pertained only to Jackson, not Strickland.

34

Luce statements prior to trial. Wright sought reconsideration of this Brady claim, contending that the 3.850 court improperly found defense counsel knew of the Brown and Luce statements and interviewed Holt prior to Wright's trial. Id. at 868.

In rejecting Wright's request for reconsideration of that Brady claim, the Florida Supreme Court in 2003 found that Wright "failed to meet his burden to show the grounds for relief he alleges here were not known and could not have been known at the time of the earlier [3.850] proceeding." Id. The Florida Supreme Court stated that Wright's "argument that the first postconviction trial court misinterpreted the facts in the record [about the undisclosed statements] was raised and addressed in his appeal following that [1988] proceeding, and in a motion for rehearing." Id. "Absent a showing that Wright did not know, or could not have known, of the alleged misconstrued facts during the first postconviction proceeding, the trial court [in the present, successive 3.850] proceeding properly denied relief." Id. This was because the Florida Supreme Court could not "entertain a second appeal of [Brady] claims that were raised, or should have been raised, in a prior postconviction proceeding." Id.

Wright also argued that the 3.850 court, in 2000, should have found a Brady violation based on the State's failure to disclose, at trial, the supposed new evidence about other suspects, although some of that evidence did not exist at the

35

time of trial.  Id. at 867.  Regarding this purported new Brady material, the Florida Supreme Court stated that the State was "not required to provide all of the notes and information regarding [its] investigation."  Id. at 870.  Alternatively, the state supreme court held that Wright had not shown prejudice from the State's failure to disclose those documents.  Id.  The court stated, "The mere possibility that undisclosed items of information may have been helpful to the defense in its own investigation does not establish constitutional materiality."  Id.  The court went on, "The fact of other criminal activities and the existence of other criminals in the same neighborhood where this murder occurred does not affect the guilt or punishment of this Defendant."  Id.

The Florida Supreme Court in 2003 also considered the "cumulative effect of the evidence presented at trial, along with any Brady evidence, newly discovered evidence, and evidence that would have been presented at trial but for the ineffective assistance of counsel."  Id. at 871.  The court stated: "Having found that each claim presented in this proceeding lacks merit, we find no cumulative error."  Id.[27]

## E.    State Petition for Writ of Habeas Corpus and Denial, 2002–2003

---

[27]The Florida Supreme Court, in 2003, acknowledged that in its earlier, 1991 consideration of Wright's 3.850 motion, it had denied his ineffective-trial-counsel claim by ruling only on Strickland's performance prong and not addressing prejudice.  Wright III, 857 So. 2d at 868 n.1.  The state supreme court stated: "Because Wright failed to show deficient performance of trial counsel, we will not address the evidence Wright alleges would have been presented at trial but for the ineffectiveness of counsel."  Id.

At the same time of his second 3.850 appeal, Wright also filed a petition in the Florida Supreme Court for a writ of habeas corpus. In his 2002 state habeas corpus petition, Wright argued that his death sentence should be reversed because, inter alia, the Florida Supreme Court, in his 1985 direct appeal, reversed the trial court as to one of the four aggravating circumstances, but did not remand for resentencing or state that the error was harmless beyond a reasonable doubt. In 2002, Wright contended that the state supreme court, in 1985, had thus failed to comply with the requirements the U.S. Supreme Court, seven years later, articulated in Sochor v. Florida, 504 U.S. 527, 112 S. Ct. 2114 (1992). Wright argued: "[The Florida Supreme Court's] ruling on direct appeal was erroneous as this Court struck an aggravating factor on direct appeal and failed to conduct the proper harmless error analysis as required by Sochor."

In its 2003 decision denying Wright's 3.850 claims, the Florida Supreme Court also denied Wright's habeas petition. Wright III, 857 So. 2d at 878–79. Even though the U.S. Supreme Court had not issued its 1992 Sochor decision when the Florida Supreme Court affirmed Wright's convictions and death sentence on direct appeal, the Florida Supreme Court in 2003 performed the harmless error analysis required by Sochor. Id.

In so doing, the Florida Supreme Court concluded that "even after removing [the cold, calculated and premeditated factor ("CCP")] from consideration of the

37

valid aggravating circumstances, three aggravating circumstances remain and no valid mitigating circumstances exist." Id. (footnote omitted). The Florida Supreme Court added that: (1) "[u]nder the circumstances of this case, we find there is no likelihood of a different sentence even if the CCP aggravator had been eliminated from the trial court's consideration"; and (2) "[t]hus, the trial court's reliance on the unsupported aggravator was harmless error . . . . We therefore deny relief on this claim." Id. at 879 (footnote omitted).

## X.  3.853 MOTION FOR DNA TESTING AND RELATED 3.850 MOTION, 2003–2008

### A.    Wright's Motion for DNA Testing, 2003

On August 11, 2003, Wright filed a motion in state court under Rule 3.853 of the Florida Rules of Criminal Procedure for DNA testing of evidence gathered from Ms. Smith's body and introduced during his 1983 trial.[28] The court granted the 3.853 motion and ordered DNA testing of: (1) pubic hair combings; (2) head hair found on Ms. Smith's dress; and (3) the semen sample taken from Ms. Smith and in the rape kit.

---

[28]Rule 3.853 "provides procedures for obtaining DNA (deoxyribonucleic acid) testing." Fla. R. Crim. P. 3.583(a).  A 3.853 "motion for postconviction DNA testing may be filed or considered at any time following the date that the judgment and sentence in the case becomes final." Fla. R. Crim. P. 3.853(d).

In an April 18, 2005 report about the semen sample, the Florida Department of Law Enforcement reported that "[t]he DNA profile from the sperm . . . matches the DNA profile from Joel Dale Wright."[29]

## B.    Denial of Additional 3.850 Motion, 2004–2008

Wright filed a successive motion for post-conviction relief asserting actual innocence. After obtaining the DNA test results, the 3.850 court held a brief hearing during which it announced that it would deny Wright's request for further DNA testing. Later, the 3.850 court issued a written order denying Wright's motion, stating: "The DNA results of the semen samples showing a match of the semen collected from the vagina and anus of the victim to the DNA of the Defendant conclusively refute the basis for [Wright's actual innocence claim]."

The Florida Supreme Court affirmed, holding that the 3.850 court appropriately relied on the DNA testing results and that Wright was not entitled to additional testing or an evidentiary hearing. See Wright v. State ("Wright IV"), 995 So. 2d 324, 327–28 (Fla. 2008).

## XI.  FEDERAL § 2254 HABEAS PETITION, 2009

On February 6, 2009, Wright filed a federal petition for habeas corpus under 28 U.S.C. § 2254. On February 24, 2010, he filed an amended petition. On March

---

[29]In a report about the hair samples, a private laboratory reported that the DNA found in the hairs did not match the DNA of Wright or Ms. Smith.

19, 2013, the district court issued a thorough, 67-page order denying each of Wright's § 2254 claims.

The district court issued a COA on these issues: (1) whether the prosecutor's failure to disclose certain material violated Wright's due process rights under Brady; (2) whether his trial counsel's not calling the family-heirloom witness during the guilt phase denied Wright effective counsel under the Sixth Amendment; and (3) whether Wright's due process rights were violated when the Florida Supreme Court reversed the trial court's finding as to one of the four statutory aggravating circumstances but affirmed Wright's death sentence without a harmless error analysis.

## XII.  STANDARD OF REVIEW

Wright's federal habeas petition is governed by 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  Recognizing that "[s]tate courts are adequate forums for the vindication of federal rights . . . , AEDPA erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." Burt v. Titlow, 571 U.S. —, —, 134 S. Ct. 10, 15–16 (2013).  Thus, "[a]s a condition for obtaining habeas corpus [relief] from a federal court, a state prisoner must show that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any

possibility for fairminded disagreement." Harrington v. Richter, 562 U.S. —, —, 131 S. Ct. 770, 786–87 (2011). The "purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction." Greene v. Fisher, 565 U.S. —, —, 132 S. Ct. 38, 43 (2011) (quotation marks omitted).

AEDPA permits federal courts to grant habeas relief only when the state court's adjudication: (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

The phrase "contrary to" means that the state court decision "contradicts the United States Supreme Court on a settled question of law or holds differently than did that Court on a set of materially indistinguishable facts." Kimbrough v. Sec'y, DOC, Fla., 565 F.3d 796, 799 (11th Cir. 2009). "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the U.S. Supreme Court]." Knowles v. Mirzayance, 556 U.S. 111, 122, 129 S. Ct. 1411, 1419 (2009) (quotation marks omitted).

41

This is because the phrase "clearly established Federal law" refers "to the holdings, as opposed to the dicta, of [the U.S. Supreme Court's] decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. 362, 412, 120 S. Ct. 1495, 1523 (2000). This Court may not "consult [its] own precedents, rather than those of [the U.S. Supreme Court] in assessing a habeas claim governed by § 2254." White v. Woodall, 572 U.S. —, — n.2, 134 S. Ct. 1697, 1702 n.2 (2014) (quotation marks and alteration omitted). Therefore, circuit precedent may not be used "to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that [the Supreme Court] has not announced." Marshall v. Rogers, 569 U.S. —, —, 133 S. Ct. 1446, 1450, reh'g denied, 133 S. Ct. 2408 (2013). Also, a circuit court "may not canvass circuit decisions to determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to [the Supreme Court], be accepted as correct." Id. at 1451.

The standard of § 2254(d) is "difficult to meet . . . because it was meant to be." Titlow, 134 S. Ct. at 16 (quotation marks omitted). This "highly deferential standard" demands that "[t]he petitioner carries the burden of proof," Cullen v. Pinholster, 563 U.S. —, —, 131 S. Ct. 1388, 1398 (2011) (quotation marks omitted), and "that state-court decisions be given the benefit of the doubt," Woodford v. Visciotti, 537 U.S. 19, 24, 123 S. Ct. 357, 360 (2002).

42

## XIII.  THE <u>BRADY</u> CLAIMS

### A.    The <u>Brady</u> Standard

In <u>Brady</u>, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment."  <u>Brady</u>, 373 U.S. at 87, 83 S. Ct. at 1196–97.  But "the Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense." <u>Kyles v. Whitley</u>, 514 U.S. 419, 436–37, 115 S. Ct. 1555, 1567 (1995).  To prevail on a <u>Brady</u> claim, the defendant must establish: (1) the evidence at issue is favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence was suppressed by the State, either willfully or inadvertently; and (3) the defendant incurred prejudice.  <u>Strickler v. Greene</u>, 527 U.S. 263, 281–82, 119 S. Ct. 1936, 1948 (1999); <u>see also</u> <u>Allen v. Sec'y, Fla. Dep't of Corr.</u>, 611 F.3d 740, 745–46 (11th Cir. 2010).

A defendant cannot meet the second prong when, "prior to trial, [he] had within [his] knowledge the information by which [he] could have ascertained the alleged <u>Brady</u> material."  <u>Maharaj v. Sec'y for Dep't of Corr.</u>, 432 F.3d 1292, 1315 (11th Cir. 2005) (quotation marks omitted).  In such cases, "[w]hen the defendant has equal access to the evidence[,] disclosure is not required" and "there is no suppression by the government."  <u>Id.</u> at 1315 & n.4 (quotation marks omitted).

43

Brady's prejudice prong, also referred to as the "materiality prong," is met when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Kyles, 514 U.S. at 433, 115 S. Ct. at 1565 (quotation marks omitted); see also United States v. Bagley, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383 (1985).  We ask "whether the government's evidentiary suppressions, viewed cumulatively, undermine the confidence in the guilty verdict." Allen, 611 F.3d at 746.  In doing so, we first evaluate the effect of each suppressed item on its own and then weigh the cumulative impact of all the suppressed evidence. Kyles, 514 U.S. at 436 n.10, 115 S. Ct. at 1567 n.10.  Only at the end do we consider the suppressed evidence "collectively, not item by item." Id. at 436, 175 S. Ct. at 1567.

## B.    Alleged Immunity Agreement About Scrap Metal Thefts

The 3.850 court found no immunity agreement existed as to the scrap metal thefts.  The Florida Supreme Court affirmed on this basis.  See Wright II, 581 So. 2d at 883.  The 3.850 evidence amply supported this fact finding.

The evidence showed, inter alia: (1) defense counsel was aware of the scrap metal thefts prior to trial; (2) Westberry received a Contract of Immunity limited to his entering Ms. Smith's residence; (3) Wright, through counsel, obtained this Contract of Immunity in discovery and used it, as well as Westberry's plea agreement to a misdemeanor, in an attempt to impeach Westberry at trial; and

44

(4) the State did not grant Westberry immunity from prosecution for any other crimes or criminal acts Westberry may have committed, including thefts of scrap metal. For example, Westberry answered "No" when asked whether prosecutor "Dunning [ever] once told [him] he would not prosecute [him] on the scrap metal deal if [he would] testify against Joe[l] Dale Wright?"

While prosecutor Dunning stated "it was extremely doubtful" that Westberry would be prosecuted for the scrap metal thefts, he also told Westberry that "if the Sheriff's Office did develop information that would give us probable cause where we could file he may well be charged with it."

To support his scrap metal-immunity agreement claim, Wright relies on Dunning's statement from the 3.850 evidentiary hearing in 1988: "[T]his was a limited grant of immunity. We weren't out prosecuting a burglary case at this point in time, we were prosecuting a first degree murder." In making this statement, Dunning was emphasizing that his focus was on prosecuting a first-degree murder case for which Westberry had received a limited grant of immunity and he was not actively trying to make a burglary case against Westberry for scrap metal thefts. Thus, this statement does not support Wright's claim.

In any event, in light of the evidence supporting the fact finding that no immunity agreement regarding scrap metal thefts existed, and thus there was no such Brady material, Wright has failed to show the state courts made an

45

unreasonable fact finding, or unreasonably applied <u>Brady</u>, as to the scrap metal-immunity agreement claim.  <u>See</u> 28 U.S.C. § 2254(d).[30]

## C.    Prosecutor Dunning's Notes

As to Dunning's notes, the 3.850 court found those notes contained only "a summary of Westberry's prior statements, in Westberry's own words."  The 3.850 court concluded, based on this fact finding, that the notes were not <u>Brady</u> material. The Florida Supreme Court affirmed, quoting the 3.850 court.  <u>See</u> <u>Wright II</u>, 581 So. 2d at 883, 886.

The state court's fact findings about what the notes contained were supported by evidence and were not unreasonable.  Both Westberry and Dunning testified that the notes contained only statements Westberry previously made to Dunning and Westberry did not rely on the notes while testifying.  Further, the state court did not unreasonably apply <u>Brady</u> in determining that the notes were not <u>Brady</u> material.

Applying <u>Brady</u>, this Court considered a similar § 2254 claim in <u>Mills v. Singletary</u>, 63 F.3d 999 (11th Cir. 1999).  Akin to Wright, the petitioner in <u>Mills</u> alleged that, prior to the guilt phase of his murder trial, the State had "prepared

---

[30]To the extent that Wright argues that the State's failure to inform him of Westberry's admission of being involved in an illegal scrap metal operation was a <u>Brady</u> violation, we also reject that claim.  The Florida Supreme Court held that the "record reflects that defense counsel was aware of the scrap metal thefts and, in fact, proffered testimony at trial regarding this activity.  On the basis of this record, we find the trial judge properly denied relief on this claim." <u>Wright II</u>, 581 So. 2d at 886.  This determination was also not unreasonable in light of the record in this case.

typed 'scripts' of the testimony [two key witnesses] were to present to the jury on direct examination," which "contained the questions the witnesses were to be asked and the answers they were to give in response and were given to [the witnesses] to study before they took the stand." Id. at 1017. The evidence in Mills's post-conviction hearing showed that the answers in the so-called "scripts" were "one- or two-word prompts, mark[ing] important topics that [the prosecutor] wanted to ensure were covered" and "the answers were obtained from [the witnesses]." Id. at 1018. Based on this evidence, the state courts concluded that the State "had done nothing improper by using the lists and not disclosing them to [the defendant]." Id. This Court agreed "that the prosecution's use of these lists was not improper and that the lists are not Brady material." Id.

Just like the lists of topics and questions at issue in Mills, the 3.850 evidence here established that Dunning's notes contained Westberry's own statements. As in Mills, the State's use of the notes here "was not improper" as the notes were not Brady material, and we defer to the state courts' adjudication in that regard. See 28 U.S.C. § 2254(d).

## D.    Holt, Brown, and Luce Statements

Turning to the Holt, Brown, and Luce statements, we already have recounted how those statements mentioned encounters with Jackson and/or Strickland. Wright claims the contents of the statements made Jackson and Strickland suspects

47

and thus were exculpatory material under Brady.  The 3.850 court rejected this Brady claim primarily because: (1) Wright, through counsel and his investigator, had access to the same information in these statements; and (2) it was "highly speculative" that the statements were exculpatory anyway.  The Florida Supreme Court affirmed.  See Wright II, 581 So. 2d at 883, 886.

The state courts' decisions—finding that Wright's defense team had access to the same information contained in the Holt and Luce statements—were not unreasonable but were supported by the evidence.  Both defense counsel Pearl and investigator Williams testified that they interviewed Holt and that Holt provided them with the same information in her written statement.  In fact, Pearl conceded that he "discovered it independently," referring to the information in the Holt statement.

Although investigator Williams could not specifically recall interviewing Luce, he remembered certain contents of Luce's statement and testified that he and Pearl probably talked to Luce prior to trial because he did a "neighborhood interview" and Luce lived in the neighborhood.  It was undisputed that Williams "worked closely" with Pearl and discussed information with him.  Williams admitted that Pearl knew about Jackson and Strickland as possible suspects. Williams talked to the Sheriff's investigators about Jackson and Strickland, and the Sheriff's investigators ran Jackson and Strickland past him.

48

In light of this evidence, the 3.850 court did not unreasonably find that the defense had access to the information in the Holt and Luce statements. A defendant cannot prevail on a Brady claim where he had "equal access" to the information forming the basis of the claim. See Maharaj, 432 F.3d at 1315 n.4.[31]

The state courts' decisions—that the Brown and Luce statements were not exculpatory—were also supported by the record. Nothing in Brown's statement (about Strickland) or Luce's statement (about Jackson and Strickland arguing) was exculpatory as to Wright. And, nothing in those two statements negated Wright's involvement in Ms. Smith's rape and murder or affirmatively showed either Jackson or Strickland raped or killed Ms. Smith.

Wright also argues that disclosure of the Holt, Brown, and Luce statements would have encouraged Pearl to further investigate Jackson and would have led to the discovery of exculpatory evidence as to Wright. We reject that argument because Pearl and Williams already knew about Jackson and Strickland well before trial and did not discover evidence about them that exculpated Wright.

Indeed, to this date, and despite having these statements for two decades now, Wright's post-conviction defense team still has not gathered any evidence showing Jackson or Strickland raped and killed Ms. Smith. And a Brady claim

---

[31]It is unclear whether Pearl or Williams interviewed Brown and had equal access to her information. As to the Brown statement, we thus rely on only the state court's finding that the information in Brown's statement was not exculpatory.

fails when it is only speculative that the materials at issue would have led to exculpatory information.  See Maharaj, 432 F.3d at 1314–16 (§ 2254 petitioner's Brady claim that undisclosed materials would have led him to "other evidence, which in turn may have shown that the [victims] were killed by a Colombian [drug] cartel" failed because the "highly speculative chain" was insufficient).

In sum, the record supports the state courts' fact findings regarding Wright's defense team having access to the information in the Holt and Luce statements. Further, the state courts' conclusions as to the non-exculpatory nature of the Brown statement, and the Luce statement for that matter, were not unreasonable applications of Brady.  Based on those grounds, we defer to the state courts' adjudications of Wright's claims about the statements.  See 28 U.S.C. § 2254(d).[32]

## XIV.  THE INEFFECTIVE-COUNSEL CLAIM

### A.    Strickland Standard

Wright's ineffective-counsel claim is governed by the Supreme Court's two-pronged test announced in Strickland.  See Pooler v. Sec'y, Fla. Dep't of Corr.,

---

[32]Reading the COA in the placement and context of the different components in the district court's order, we conclude that the COA encompasses Brady claims relating only to the existence of these materials: (1) the alleged immunity agreement about scrap metal thefts; (2) prosecutor Dunning's notes; and (3) the Holt, Brown, and Luce statements.  Although the district court stated that it would grant a COA "on the Brady issue," it did so in the context of its discussion of these Brady claims, and only later discussed other alleged Brady materials.

To the extent that the COA arguably covers other alleged Brady materials, we conclude that those claims lack merit, too.  Specifically, the other materials were either not exculpatory, were not related to the Smith murder at all (such as the public incident reports about Jackson and the arrest reports regarding Bobby Hackney), did not come into the possession of the Sheriff's Office investigators until after Wright's August 1983 trial, or otherwise had no bearing on Wright's guilt or innocence.

50

702 F.3d 1252, 1269 (11th Cir. 2012).  Under Strickland, to establish

constitutionally ineffective counsel, a defendant must show that: (1) his attorney's

performance was deficient; and (2) the deficient performance prejudiced the

defense.  Strickland, 466 U.S. at 687, 104 S. Ct. at 2064.

The Strickland performance standard is "objectively reasonable attorney

conduct under prevailing professional norms."  Johnson v. Upton, 615 F.3d 1318,

1330 (11th Cir. 2010); see Strickland, 466 U.S. at 688, 104 S. Ct. at 2065 ("The

proper measure of attorney performance remains simply reasonableness under

prevailing professional norms.").  We look at what professional norms existed at

the time that the attorney acted.  See Johnson v. Sec'y, DOC, 643 F.3d 907, 931

(11th Cir. 2011).  The question is "whether, in light of all the circumstances, the

identified acts or omissions were outside the wide range of professionally

competent assistance."  Strickland, 466 U.S. at 690, 104 S. Ct. at 2066.  A

petitioner bears the burden of proving, "by a preponderance of competent

evidence, that counsel's performance was unreasonable."  Chandler v. United

States, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc); accord Richter, 131 S. Ct.

at 790 ("Strickland . . . calls for an inquiry into the objective reasonableness of

counsel's performance, not counsel's subjective state of mind.").

For prejudice, the standard is whether "'there is a reasonable probability

that, but for counsel's unprofessional errors, the result of the proceeding would

51

have been different.'"  Rose v. McNeil, 634 F.3d 1224, 1241 (11th Cir. 2011)

(quoting Strickland, 466 U.S. at 694, 104 S. Ct. at 2068).  To satisfy the prejudice

prong, the "likelihood of a different result must be substantial, not just

conceivable."  Richter, 131 S. Ct. at 792.  "Counsel's errors must be so serious as

to deprive the defendant of a fair trial, a trial whose result is reliable."  Id. at 787–

88 (quotation marks omitted).

"Establishing that a state court's application of Strickland was unreasonable

under § 2254(d) is all the more difficult."  Id. at 788.  We have previously held that

"[w]here the highly deferential standards mandated by Strickland and AEDPA

both apply, they combine to produce a doubly deferential form of review that asks

only whether there is any reasonable argument that counsel satisfied Strickland's

deferential standard."  Downs v. Sec'y, Fla. Dep't of Corr., 738 F.3d 240, 258

(11th Cir. 2013) (quotation marks omitted).

## B.    Application of Strickland Standard Here

Wright argues that defense counsel Pearl was ineffective for failing to call a

witness to explain the family origin of the "glass vase" mentioned in Martinez's

trial testimony.

As discussed above, Pearl called Martinez to refute Westberry's assertion

that Wright stole $290 from Ms. Smith's house.  Martinez did so by testifying that,

days after Ms. Smith's murder, Wright was counting his pennies from a "glass

52

vase" in an attempt to collect enough money to purchase beer for his friends and him.  Martinez's testimony had a sound evidentiary purpose.

Pearl, however, was concerned that the State might argue that the "glass vase" mentioned in Martinez's testimony was the "jar of money" mentioned in Westberry's testimony.  Thus, Pearl lined up a family member to testify that the "glass vase" was a family heirloom.  At the 3.850 hearing, Pearl said he forgot to call that witness.

Wright does not fault defense counsel Pearl for calling Martinez as a witness.  Rather, Wright argues only that, after Martinez testified, Pearl failed to call Wright's family member to explain the origin of the "glass vase" mentioned during Martinez's testimony.

Before addressing performance or prejudice, we note what prosecutor Dunning said in his closing argument about Martinez's testimony.  When referencing Martinez's testimony, Dunning referred to a "jar," and never used the term "glass vase," as Martinez had.  Dunning stated:  "Then we heard from Mrs. Charlotte Martinez about this jar.  The State's the first to admit that the jar can either be attached to the residence of Lima Paige Smith or it can be unattached from the residence of Lima Paige Smith."  Dunning argued that the jury had "not heard any competent testimony as to who the owner of that jar was or where that jar was originally obtained."  Dunning attempted to conflate Martinez's reference

53

to a "glass vase" with Westberry's reference to a "jar of money." He asked the jury to "[v]iew that in terms of what [it] heard from Charles Westberry about the Defendant saying not only did I take this folding money but there was a jar of coins that I took and hid behind the house."

In making this closing argument, the prosecutor misstated Martinez's testimony, saying she used the word "jar"—when in fact, she said "glass vase." As a result, defense counsel Pearl effectively pointed out in his closing argument that "Mr. Dunning called it a jar," but that Martinez had said it "was a vase, not a jar." Pearl emphasized that Martinez had testified that the "glass vase" contained only $7 in change, which was used to buy beer, and that it made no sense for Wright to use pennies from the vase to buy beer if he had access to $290 stolen from Ms. Smith's house.

Given the record as a whole, we need not address the performance prong because we so readily conclude Wright has failed to show the requisite prejudice under Strickland. See Bishop v. Warden, GDCP, 726 F.3d 1243, 1254 (11th Cir. 2013) ("[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." (quotation marks omitted)), pet. for cert. filed, No. 13-1345 (U.S. Mar. 3, 2014); Ward v. Hall, 592 F.3d 1144, 1163 (11th Cir. 2010) ("[A] court

need not address the performance prong if the petitioner cannot meet the prejudice prong . . . .").[33]

While Pearl failed to call the family member to establish the family heirloom-nature of the glass vase, Pearl nonetheless used Martinez's testimony effectively, pointed out to the jury how the State had misstated Martinez's testimony, noted that the "glass vase" and "jar of money" were different, and argued that it made no sense for Wright to count pennies from a glass vase if he had $290 in his possession. Indeed, the prosecutor's own closing argument even admitted "the jar" might be "attached" or "unattached" to Ms. Smith's residence. And, any family member of Wright's called to identify the glass vase as a family heirloom would have been cross-examined about how Wright casually gave the alleged heirloom vase to Martinez while out drinking beer. Further, the State presented extensive evidence of Wright's guilt as recounted above.[34] For all of these reasons together, Wright has not established the requisite prejudice.

---

[33]Although the state courts did not perform their own prejudice analysis, we conclude even under de novo review that Wright failed to show prejudice.

[34]In any retrial, the State argues that its case would be even stronger, as the State could present the DNA-semen evidence from Wright's successive habeas proceedings that linked Wright to Ms. Smith. See Porter v. McCollum, 558 U.S. 30, 41, 130 S. Ct. 447, 453–54 (2009) (holding court must consider the totality of the available mitigation evidence—both that adduced at trial and in the habeas proceeding—and reweigh it against all evidence in aggravation); Wong v. Belmontes, 558 U.S. 15, 24, 27–28, 130 S. Ct. 383, 388–89, 391 (2009) (concluding § 2254 petitioner could not establish prejudice because expert testimony about petitioner's "mental state, seeking to explain his behavior, or putting it in some favorable context" would have opened the door to the State introducing rebuttal evidence of petitioner's previous murder).

## XV.  THE AGGRAVATING CIRCUMSTANCES CLAIM

Wright's last issue is based on the Florida Supreme Court's 1985 direct appeal decision, which affirmed Wright's death sentence, despite the fact that it reversed the state trial court's finding of the "cold, calculated and premeditated" aggravating circumstance.  Wright I, 473 So. 2d at 1282.  The Florida Supreme Court reasoned: "Because the [trial] court properly found there were no mitigating and three aggravating circumstances, we conclude the imposition of the death penalty was correct and find it unnecessary to remand for a new sentencing hearing."  Id.  Wright argues that, after reversing one aggravating circumstance, the Florida Supreme Court should have reweighed the remaining three statutory aggravating circumstances and no mitigating circumstances or made a harmless error calculation, but the court failed to do either.

Wright relies on the U.S. Supreme Court's decision in Sochor v. Florida, 504 U.S. 527, 112 S. Ct. 2114 (1992), decided seven years after his direct appeal in 1985.  In Sochor, the Supreme Court concluded that, in capital cases arising out of states with death penalty statutes like Florida's, when a state appellate court reverses as to a trial court's findings of aggravating or mitigating circumstances,

On the other hand, Wright argues that he has not yet had the opportunity to cross-examine the DNA-semen expert in a full-blown evidentiary hearing and that such adversarial testing is required before this Court may determine the weight of the DNA evidence in its prejudice analysis.

We need not resolve whether or how this new DNA evidence should be counted here because Wright has not shown the requisite prejudice in any event.

56

remand for resentencing is not necessarily required.  Id. at 532, 112 S. Ct. at 2119.

"[S]hort of remand," though, the state appellate court must "either itself reweigh

without the invalid aggravating factor or determine that weighing the invalid factor

was harmless error."  Id. (citing Parker v. Dugger, 498 U.S. 308, 320, 111 S. Ct.

731, 739 (1991)).

The U.S. Supreme Court in Sochor made clear that it was not requiring "a

particular formulaic indication by state courts before their review for harmless

federal error will pass federal scrutiny."  Id. at 540, 112 S. Ct. at 2123.  Yet, "a

plain statement that the judgment survives on such an enquiry is clearly

preferable."  Id.  The U.S. Supreme Court vacated and remanded in Sochor

because the state court decision lacked such a "plain statement," the citations in the

state court decision stopped "far short of clarity" as to whether the state court had

performed this inquiry, and there was nothing that could "even arguably substitute

for explicit language signifying that the State Supreme Court reviewed for

harmless error."  Id.

Wright's claim fails for two reasons, either of which is sufficient alone.

First, the Florida Supreme Court affirmed Wright's death sentence on direct appeal

in 1985.  See Wright I, 473 So. 2d at 1282.  To the extent Wright claims the

Florida Supreme Court erred in his direct appeal, Wright's claim lacks merit.  The

Florida Supreme Court's 1985 decision was before Sochor was decided in 1992,

and thus that state court decision did not violate "clearly established Federal law." See 28 U.S.C. § 2254(d)(1).[35]

Second, Wright ignores that, in its 2003 decision, the Florida Supreme Court later addressed his Sochor claim and actually conducted a harmless error analysis. See Wright III, 857 So. 2d at 878–79. Wright's Sochor claim was not made until his 2002 petition for a writ of habeas corpus filed directly in the Florida Supreme Court. Subsequently, as we recounted above, the Florida Supreme Court in 2003 rejected the Sochor claim based on its express finding that "the trial court's reliance on the unsupported aggravator was harmless error." Id. at 879. The state supreme court's harmless error analysis and adjudication of Wright's Sochor claim were not unreasonable applications of clearly established federal law or unreasonable determinations of the facts. 28 U.S.C. § 2254(d)(1). The belated nature of the state supreme court's analysis does not negate its validity or effectiveness in ensuring that Wright's death sentence is not infirm. The Florida Supreme Court has already done what Wright claims should have been done.

## XVI.  CONCLUSION

For the above stated reasons, we affirm the district court's denial of Wright's § 2254 petition.

---

[35]To the extent Wright relies on decisions that came before Sochor—such as Clemons v. Mississippi, 494 U.S. 738, 110 S. Ct. 1441 (1990), Stringer v. Black, 503 U.S. 222, 112 S. Ct. 1130 (1992), or Parker v. Dugger, 498 U.S. 308, 111 S. Ct. 731 (1991)—those decisions were also all decided after Wright's 1985 direct appeal and thus do not support his claim.

**AFFIRMED.**